**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 11a0018n.06

**No. 09-2076**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

**Jan 07, 2011**

LEONARD GREEN, Clerk

|  |  |  |
|---|---|---|
| TERRI L. KALMBACH, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR THE |
| | ) | EASTERN DISTRICT OF MICHIGAN |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |

Before:  BOGGS and CLAY, Circuit Judges; and WISEMAN, District Judge.[*]

WISEMAN, District Judge.  Plaintiff-Appellant Terri Kalmbach appeals a district court order

affirming an administrative law judge's denial of Kalmbach's application for Disability Insurance

Benefits (DIB).  Kalmbach presents two issues for review:  (1) whether the Commissioner properly

evaluated the medical evidence in the record, and (2) whether the Commissioner properly evaluated

Kalmbach's subjective complaints.  Because we find that the ALJ failed to provide good reasons for

rejecting the opinions of Kalmbach's treating physicians, that his rejection of Kalmbach's subjective

complaints is not supported by substantial evidence, and further that proof of disability is strong and

there effectively is no opposing evidence, we reverse and remand for an award of benefits.

**I.      PROCEDURAL BACKGROUND**

---

[*]The Honorable Thomas A. Wiseman, Jr., Senior United States District Judge for the Middle
District of Tennessee, sitting by designation.

Kalmbach applied for DIB on July 26, 2005, alleging that she had become disabled on April 27, 2005, by fibromyalgia, arthritis, and carpal tunnel syndrome. Her claim was denied initially. She requested a hearing before an administrative law judge (ALJ), which was conducted on November 8, 2007. Kalmbach, who was represented by an attorney, appeared and testified at the hearing. A vocational expert also testified. On February 7, 2008, the ALJ, Bennett S. Engelman, issued a decision finding that Kalmbach was not disabled. The Appeals Council denied Kalmbach's request for review on June 11, 2008, rendering the ALJ's decision the final decision of the Commissioner. Kalmbach sought review of the Commissioner's decision in the United States District Court for the Eastern District of Michigan. After briefing by the parties, the magistrate judge recommended that judgment be entered in favor of the Commissioner. Over Kalmbach's objections, the district court adopted the magistrate judge's report and recommendation and affirmed the Commissioner's final decision, finding that the ALJ had applied the correct legal standards and his decision was supported by substantial evidence in the record. This appeal followed.

## II.     THE ADMINISTRATIVE RECORD

### A.     The Medical Evidence

Upon referral from Kalmbach's long-time family physician, Dr. Richard Beison, Dr. Vladimir Ognenovski, a specialist in rheumatology, began treating Kalmbach in May 2001 for complaints of progressive fatigue and joint pain. (AR 297.) At the time she was forty-three years old, had recently been diagnosed with non-insulin-dependent diabetes mellitus, was "moderately

overweight,"[1] and was also being treated for hypothyroidism. On her first visit with Dr. Ognenovski, Kalmbach described a one-year history of progressive fatigue, with disturbed sleep and excessive day-time somnolence, as well as a ten-year history of progressive pain affecting all of her joints, and morning stiffness. Her major complaint was fatigue; although she worked full-time, she indicated she was incapable of doing much after work. (AR 297.) Dr. Ognenovski's impression was fibromyalgia, and he also referred her to a sleep clinic for evaluation and treatment of possible sleep apnea. He prescribed a trial of non-steroidal medication on an as-needed basis and recommended an exercise program. (AR 298–99.)

In August 2001, Dr. Ognenovski observed that Kalmbach's medical history was notable for hypertension, diabetes, asthma, hypothyroidism, TMJ, carpal tunnel syndrome, gastroesophageal reflux, and obesity, as well as suspected sleep apnea. Kalmbach reported that she was engaging in physical therapy and water aerobics and was feeling "less stiff and more mobile" and, despite continued arthralgia and myalgia pain, was "more functional and comfortable." (AR 307.) She continued to work full time, but occasionally took days off when she was more symptomatic. She had full range of motion and strength, but a "focused muculoskeletal exam" revealed "multiple soft-tissue tender points," a total of 18 out of 18. Dr. Ognenovski's assessment was "fibromyalgia with ongoing arthralgia at baseline" and probable sleep apnea. (AR 307.) He recommended continued

---

[1] By August 2001, she was described in the Sleep Disorders Clinic notes as morbidly obese. (AR 304.)

use of muscle relaxants and non-steroidal anti-inflammatory medications (NSAIDs) (*i.e.*, Celebrex and Vioxx) as needed, as well as cardiovascular exercise.

Over the next several years, Kalmbach saw Dr. Ognenovski two or more times per year for follow-up treatment of her fibromyalgia. In October 2001, Dr. Ognenovski discussed with Kalmbach the possibility of reducing her hours at work "as a way of coping with her [fibromyalgia] symptoms and fatigue." (AR 309.) In February 2002 he noted that she had been diagnosed with sleep apnea, had begun using a Continuous Positive Airway Pressure (CPAP) machine, and, as a result, she was sleeping somewhat better and feeling less fatigued. He also noted that she was working reduced hours, and that her fibromyalgia symptoms were much improved as a result of better sleep and less work, though she "of course" continued to take NSAIDs and muscle relaxants.

In July 2002, she was still working reduced hours, was sleeping better, and her energy level remained "stable." She was "less symptomatic," but Dr. Ognenovski recommended increased Vioxx and Ultram for three to five days at those times when she was suffering flare-ups of more intense pain. (AR 314.) In May 2003, Dr. Ognenovski noted Kalmbach did "not feel too bad," but that her energy level fluctuated and she continued to have arthralgia and stiffness in the morning, as well as occasional day-time arthralgias and "occasionally feeling in a fog," which affected her performance. He also noted she tended to be "more symptomatic in the winter months." (AR 320.) She was concerned at that time about the possibility of losing her job. Dr. Ognenovski believed that, "overall, she would benefit by remaining functional," and encouraged her to continue working if possible.

(AR 320.)  In September 2004, he noted that her fibromyalgia was at "baseline" and that she "remain[ed] fairly functional" and continued to work part-time.  (AR 388.)

In June 2005, Dr. Ognenovski noted Kalmbach had lost her job, had not been able to find new employment, and was "looking into the possibility of pursuing medical disability."  (AR 331.) She complained of new left-knee pain.  Her fibroymyalgia was "unchanged," with ongoing generalized arthralgia and myalgia, morning stiffness, and fatigue.  (AR 331–32.)  In October 2005, Dr. Ognenovski noted that in addition to fibromyalgia Kalmbach had osteoarthritis in both knees, morbid obesity and sleep apnea.  Kalmbach continued to report generalized pain and fatigue, as well as morning stiffness.  Dr. Ognenovski's impression was "[f]ibromyalgia with ongoing symptoms." He noted: "I realistically did not expect a significant change in her symptoms given the number of comorbid conditions that could contribute to the symptoms of fibromyalgia," in particular, her obesity.  He noted on that day that she had requested a formal statement from him regarding her disability, and he believed that, at that point, she was "totally disabled from any type of work."  (AR 211.)

Kalmbach's condition was basically unchanged through 2006 and 2007, except she was diagnosed with osteoarthritis in her left knee and tenderness over the lateral epicondryles of both elbows as well as bursitis in her hips.  She continued to have soft-tissue tenderness throughout, consistent with fibromyalgia. Dr. Ognenovski continued to prescribe NSAIDs and muscle relaxants.

Dr. Ognenovski filled out a "Medical Statement" form in December 2005 in which he indicated that, beginning in April 2005, Kalmbach was limited in her ability to work as a result of

pain and fatigue as well as difficulty concentrating as a result of fibromyalgia and sleep apnea. (AR 154.)

Dr. Ognenovski completed an "Impairment Questionnaire" related to Kalmbach's fibromyalgia in March 2006 and again in October 2007. On both dates he noted that he had treated plaintiff for fibromyalgia two to three times a year since May 2001; that she met the American Rheumatological criteria for fibromyalgia; and that her prognosis was "fair." (AR 235, 97.) He described the clinical findings related to fibromyalgia as "[g]eneralized soft-tissue pain, especially hips, knees and shoulders," besides "morbid obesity and deconditioning." (AR 235, 97.) He listed Kalmbach's symptoms as including fatigue, joint and muscle pain, daytime somnolence, generalized weakness, stiffness, and difficulty concentrating. (AR 236, 98.) He described the frequency of the pain as "daily & constant" with a severity level of 7–8, and averred that the patient was not a malingerer. (AR 237, 99.) He assessed her as capable of sitting one to two hours per day, and standing or walking up to one hour a day. He indicated Kalmbach should not sit continuously in a work setting, and that she needed to move around for ten to fifteen minutes every two hours. He also indicated she would need to rest two to four hours daily, that she would have "good and bad days," and that she was likely to be absent from work more than three days a month as a result of her impairments. He estimated she could lift and carry up to ten pounds occasionally. Dr. Ognenovski also indicated that Kalmbach was incapable of working even a "low stress" job as a result of her difficulties concentrating and difficulties with computation. (AR 238–39, 100–11.) Under "additional comments," Dr. Ognenovski noted that Kalmbach was "totally incapacitated in her

ability to perform at her usual job due to constant pain, fatigue & difficulty concentrating"; he also noted that "the earliest date" to which his description of her symptoms and limitations applied was 2000. (AR 240, 102.)

Plaintiff's primary care physician, Dr. Robert Beison, filled out a "Multiple Impairment Questionnaire" in October 2007, in which he listed Kalmbach's diagnoses as including fibromyalgia, GERD, diabetes, asthma, right hip piriforma syndrome, and bilateral carpal tunnel syndrome. He identified the clinical findings associated with these conditions as including extremity pain and numbness, difficulty walking, loss of manual dexterity, occasional dizziness and loss of balance, difficulty thinking/concentrating, and fatigue, among others. (AR 111.) Dr. Beison assessed Kalmbach as having constant, daily "complete body" pain, rating an "8" in severity on a 10-point scale, and fatigue at level 6 on a 10-point scale. He indicated stress and anxiety exacerbated pain and fatigue, and that her symptoms were likely to increase if she was placed in a competitive work environment. He opined that she was not capable of working a full-time competitive job that required activity on a sustained basis, or of working a low-stress job. Like Dr. Ognenovski, Dr. Beison indicated Kalmbach was not a malingerer. (AR 113–16.) He also indicated she would need to take daily rest breaks of one to two hours, that she would have "good days" and "bad days," but would likely be required to be absent from work as a result of her symptoms more than three days a month. (AR 117.) Finally, Dr. Beison noted that he agreed with Dr. Ognenovski that Kalmbach was unable to perform any type of work due primarily to her fibromygalgia, osteoarthritis, sleep apnea, morbid obesity and carpal tunnel syndrome.

B.      **The Hearing before the ALJ**

At the hearing conducted on November 8, 2007, Kalmbach testified that she was forty-nine years old, had graduated from high school and had completed several courses at a community college. She had not worked since her stated disability date of April 27, 2005. Prior to that date, she had worked for eleven years doing clerical and administrative work for the same employer, until the company was sold and she began working for the successor company. During the last year she worked, she primarily was answering the phone. She stated she stopped working in April 2005 because the new owners moved the office to a location further away from her home, and she could not drive that far because of her carpal tunnel syndrome, by which she was limited to thirty miles per day. She was initially awarded unemployment benefits but then had to repay it six months later because it was determined that her doctor said she was unable to work full-time, so unemployment benefits should not have been approved. She also testified that during the last couple of years she worked, she did not work a full eight-hour day. She was paid around $20,000 per year through 2001, and her earnings decreased after that as her hours decreased. She stated that her hours decreased as "the fibromyalgia started coming in and I started getting worse and worse." (AR 448.) In 2004, she made $10,799. In 2005, she made $4,500. She testified that her employer was very lenient and that she was not required to work very hard at her job, particularly during the last couple of years. In her written materials, Kalmbach noted that during the last four years at work, she called in sick three to four days per month and was frequently late because of her fibromyalgia symptoms. (AR 73.)

Kalmbach testified that the symptoms that prevented her from working were pain and fatigue, and she described the pain as "all over" but primarily in her arms and back, and to a lesser extent in her legs. (AR 442.) She rated the pain as generally between five and eight on a ten-point scale. She noted that the CPAP machine had helped with her sleep but she still felt fatigued for most of the day. As for her other medical conditions, she indicated her diabetes was basically under control with medication and that braces had helped with her carpal tunnel syndrome when she was still working. She also testified that she had difficulty concentrating and that repetitive motions increased her pain.

With respect to her daily activities as of the date of the hearing, Kalmbach stated that she generally woke up around 9:00 and spent a half-hour stretching in bed as that made it "easier to move." (AR 451.) Her mother, with whom she lives, sometimes had to help her dress. Some days she hurt so much that she did not get dressed; these days occurred two to three times per month. She testified that, most days, she would make her own breakfast and spend the morning reading or watching television. She would occasionally take her mother to the grocery store, go to the pharmacy to pick up prescriptions, or attend church, but had learned she could only do one such activity outside the home per day. If she did more than that, she became too fatigued and would "hurt for two or three days afterwards." (AR 452.) She thought she could probably walk the length of one football field but it would hurt; she could not walk two football field lengths at one time. She estimated she could stand for twenty to thirty minutes at a time, sit for an hour before she needed to get up and move, and lift up to ten or fifteen pounds. She spent most of her days in a Lazy Boy reclining chair with her feet elevated parallel to the ground, which took pressure off her back.

Kalmbach testified that she is five feet two inches tall and at the time of the hearing weighed 350 pounds. She had tried unsuccessfully to lose weigh and had difficulty exercising.

A vocational expert also testified at the hearing. She had prepared a report prior to the hearing in which she opined that the plaintiff's position as office manager was skilled sedentary work. After hearing Kalmbach's testimony, she concluded that the position was more akin to that of secretary, and then reception clerk, both of which were semi-skilled sedentary jobs. She also testified that a person could be absent for reasons related to a medical impairment a maximum of two days per month and still maintain a reception clerk job as it is typically performed.

## C. The ALJ's Decision

In his written decision issued February 7, 2008 the ALJ found that Kalmbach had established that she had "severe impairments" including obesity, asthma, diabetes, and sleep apnea. (AR 16.) Despite the fact that Kalmbach's entire disability application was based upon the symptoms arising from fibromyalgia, he did not find her fibromyalgia, or the symptoms related to it, to be a severe impairment. The ALJ noted that Kalmbach had been treated by Dr. Ognenovski on June 15, 2005 "for fibromyalgia complaints." (AR 16.) The ALJ stated that on that day, Dr. Ognenovski had observed that although Kalmbach was morbidly overweight and had soft-tissue tenderness in multiple areas, she was in "no distress," had "full mobility," had no significant objective skeletal findings, and was treated with over-the-counter Naprosyn. (AR 17.) The ALJ noted that the follow-up exam in October 2005 was basically the same.

The ALJ recognized that both Dr. Beison and Dr. Ognenovski had completed forms indicating their opinions that the plaintiff was incapable of working a full-time job. With respect to the March 2006 and October 2007 questionnaires completed by Dr. Ognenovski, the ALJ observed that Dr. Ognenovski opined that Kalmbach met the American Rheumatological criteria for fibromyalgia, and reported that the plaintiff "claimed constant daily pain," and that he assessed her as capable of sitting for up to one to two hours in a day and walking for less than one hour, and that she was incapable of performing even a low-stress job. In reviewing these questionnaires, the ALJ emphasized Dr. Ognenovski's findings that Kalmbach had "*normal*" biochemical profile, CBC, bone scan, MRI and x-rays, and only minimal degenerative changes. (AR 18 (emphasis in original).)

The ALJ found, purportedly "[a]fter careful consideration of the entire record," that Kalmbach had the residual functional capacity to perform sedentary work involving a sit/stand option and occasional use of the hands, and permitting absence from work up to two days per month. The ALJ found that the plaintiff's medically determinable impairments could reasonably be expected to produce her alleged symptoms, but that her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (AR 21.) He based his credibility determination largely upon the fact that Kalmbach "engage[d] in essentially normal daily and social activities," in that she admitted she "drives her car to run errands and shop for groceries and clothing. She spends time watching television, reading, talking on the telephone, and attending church services and activities." (AR 21.) He also noted she had not required hospitalization or surgical intervention or other aggressive treatments. He continued:

-11-

> The medical record contains no significant complaints of medication side effects or ineffectiveness that might reasonably prevent [her] from completing an eight-hour workday. There is no indication that her diabetes, asthma, acid reflux and hypothyroidism are not under good control with medication. The use of a CPAP helps her sleep apnea. She has full mobility. Laboratory results are essentially normal and her bone scan, MRI, and x-rays were negative with only minimal degenerative changes. There are no current EEG results showing the claimant has more than mild carpal tunnel. While the undesigned does not doubt that the claimant experiences some discomfort, the allegations of a pain level that precludes all types of work are inconsistent with the objective medical evidence, the absence of more aggressive treament, the claimant's ordinary activities, and with the evidence as a whole.

(AR 21.)

The ALJ also stated that he had considered the medical questionnaires submitted by Drs. Beison and Ognenovski indicating that Kalmbach's condition significantly reduced her ability for substantial gainful activity, but that he gave these opinions "minimal weight as they are not supported by the objective findings and appear to be based entirely on the claimant's subjective complaints. Further, it [presumably, a determination of disability] is a conclusion reserved to the Commissioner." (AR 22.)

## III. THE STANDARD OF REVIEW

We review district court decisions in cases involving Social Security disability determinations *de novo*. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Under the Social Security Act, however, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. The Act provides that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Our review is accordingly limited to determining whether substantial evidence supports the

Commissioner's findings and whether the Commissioner applied the correct legal standards. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 604 (6th Cir. 2009) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Substantiality is based on the record taken as a whole. *Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

If substantial evidence supports the ALJ's conclusion and the ALJ applied the correct legal standards, we are not at liberty to reverse the ALJ's decision even if substantial evidence exists in the record that would have supported an opposite conclusion. *Youghiogheny & Ohio Coal Co. v. Webb*, 49 F.3d 244, 246 (6th Cir. 1995). Conversely, however, we must reverse and remand if the ALJ applied incorrect legal standards, even if the factual determinations are otherwise supported by substantial evidence and the outcome on remand is unlikely to be different. *See, e.g.*, *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545–46 (6th Cir. 2004) (finding that reversal was required even though the Commissioner's decision was otherwise supported by substantial evidence, where the ALJ failed to give good reasons for not giving weight to the opinion of a treating physician, thereby violating the agency's own regulations).

## IV.   ANALYSIS

### A.   The ALJ's Evaluation of the Medical Evidence

Severe impairments are impairments that significantly limit a claimant's "physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). Although the ALJ mentioned

Kalmbach's diagnosis of fibromyalgia in the course of discussing the medical evidence, he neither identified it as a severe impairment nor explained why he believed it was not one. That oversight is gaping given that Kalmbach's disability application is premised primarily upon the pain and fatigue she experiences as a result of her fibromyalgia, and in light of the fact that she was diagnosed with the condition by a specialist in rheumatology, and both the specialist and her primary care physician agreed that Kalmbach's fibromyalgia symptoms are the primary cause of her inability to engage in sustained work activity. Moreover, this Circuit has expressly recognized that fibromyalgia can be a "severe impairment."[2] *Rogers*, 486 F.3d at 243; *Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 820 (6th Cir. 1998).

In that regard, Dr. Ognenovski, Kalmbach's treating rheumatologist since May 2001, has consistently opined that Kalmbach has been unable to perform sustained work activity since April 2005 due to her fibromyalgia and its attendant chronic pain and fatigue, complicated by other co-morbid factors including obesity and sleep apnea. Dr. Beison, the plaintiff's primary care physician, agreed with Dr. Ognenovski's assessment that Kalmbach is incapable of performing any type of substantial gainful activity as a result of the symptoms associated with fibromyalgia.

---

[2] Fibromyalgia, also called fibrositis, "is a medical condition marked by 'chronic diffuse widespread aching and stiffness of muscles and soft tissues.' Stedman's Medical Dictionary for the Health Professions and Nursing at 541 (5th ed. 2005). We note also that ours is not the only circuit to recognize the medical diagnosis of fibromyalgia as well as the difficulties associated with this diagnosis and the treatment for this condition." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 244 n.3 (6th Cir. 2007) (most internal citations omitted).

In assessing the medical evidence supporting a claim for disability benefits, the ALJ is bound by the so-called "treating physician rule," which generally requires the ALJ to give greater deference to the opinions of treating physicians than to the opinions of non-treating physicians. *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009). The rationale behind the rule is that treating physicians

> are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(d)(2). The ALJ must give a treating source opinion "controlling weight" if the treating source opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Id.* Even if the ALJ does not give controlling weight to a treating physician's opinion, he must still consider how much weight to give it; in doing so, the ALJ must take into account the length of the treatment relationship, frequency of examination, the extent of the physician's knowledge of the impairment(s), the amount of relevant evidence supporting the physician's opinion, the extent to which the opinion is consistent with the record as a whole, whether or not the physician is a specialist, and any other relevant factors tending to support or contradict the opinion. 20 C.F.R. § 404.1527(d)(2)–(6).

The ALJ's decision as to how much weight to accord a medical opinion must be accompanied by "good reasons" that are "supported by the evidence in the case record, and must be

-15-

sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5. This procedural "good reason" rule serves both to ensure adequacy of review and to permit the claimant to understand the disposition of her case. *Rogers*, 486 F.3d at 242.

We will reverse and remand a denial of benefits, even though "substantial evidence otherwise supports the decision of the Commissioner," when the ALJ fails to give good reasons for discounting the opinion of the claimant's treating physician. *Wilson*, 378 F.3d at 543–46. A failure to follow the procedural requirement "of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243; *see also Wilson*, 378 F.3d at 546 (a reviewing court "cannot excuse the denial of a mandatory procedural protection simply because . . . there is sufficient evidence in the record of the ALJ to discount the treating source's opinion and, thus, a different outcome on remand is unlikely"). Thus, while a "lack of compatibility with other record evidence is germane to the weight [accorded] a treating physician's opinion, an ALJ cannot simply invoke the criteria set forth in the regulations if doing so would not be 'sufficiently specific' to meet the goals of the 'good reason' rule." *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010).

In this case, the ALJ's entire rationale for discounting the opinions of Drs. Ognenovski and Beison was summed up succinctly in two sentences: "[T]hey are not supported by the objective findings and appear to be based entirely on the claimant's subjective complaints. Further, [the

determination of disability] is a conclusion reserved to the Commissioner." (AR 22.) As a matter of law, these do not qualify as "good reasons" and therefore do not comport with the procedural requirement embodied in 20 C.F.R. § 404.1527(d)(2). First, the fact that the ultimate determination of disability, *per se*, is reserved to the Commissioner, 20 C.F.R. § 404.1527(e), did not supply the ALJ with a legitimate basis to disregard the physicians', and particularly Dr. Ognenovski's, assessment of Kalmbach's abilities to perform work-related activities, including standing, walking, sitting, using her hands, and so forth. Dr. Ognenovski did not opine in a vacuum that Kalmbach was disabled. Rather, he opined that she was incapacitated by pain and fatigue from performing work-related activities on a sustained basis. Moreover, both Dr. Ognenovski and Dr. Beison affirmatively stated that they did not believe their patient was a malingerer or someone who exaggerated her symptoms.

Further, the ALJ's rejection of the treating physicians' opinions as unsupported by objective evidence in the record obviously stems from his fundamental misunderstanding of the nature of fibromyalgia. *Cf. Rogers*, 486 F.3d at 243 (observing that the ALJ's failure to recognize fibromyalgia as a "severe impairment" "influenced the ALJ's consideration of the medical evidence in the present case"). In his discussion of Dr. Ognenovski's treatment notes and medical findings, the ALJ repeatedly emphasized the indications that Kalmbach retained mobility in her joints and had normal blood tests, bone, scans and MRIs with only minimal degenerative changes; he harkened back to these objective findings in asserting that Dr. Ognenovski's assessment of the plaintiff's abilities was not supported by the objective medical evidence. We have recognized on more than

one occasion, however, that fibromyalgia patients generally "present no objectively alarming signs." *Rogers*, 486 F.3d at 243 (citing *Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 820 (6th Cir. 1988) (per curiam) (noting that objective tests are of little relevance in determining the existence or severity of fibromyalgia); *Swain v. Comm'r of Soc. Sec.*, 297 F. Supp. 2d 986, 990 (N.D. Ohio 2003) (observing that "[f]ibromyalgia is an 'elusive' and 'mysterious' disease" which causes "severe musculoskeletal pain"). Rather, fibromyalgia patients, like Kalmbach here, typically "manifest normal muscle strength and neurological reactions and have a full range of motion." *Preston*, 854 F.2d at 820. In the absence of other objectively ascertainable manifestations, the process of diagnosing fibromyalgia includes (1) the testing of a series of focal points for tenderness and (2) the ruling out of other possible conditions through objective medical and clinical trials. *Id.*; *Swain*, 297 F. Supp. 2d at 990. Dr. Ognenovski noted on multiple occasions that Kalmbach tested positive for tenderness at 18 of 18 focal points, and he ruled out the possibility of other causes for Kalmbach's symptoms. Thus, the ALJ's contention that the treating physicians' assessments and opinions were unsupported by other objective medical evidence was simply beside the point.

Nor can it be said that the ALJ's failure to give good reasons—a legal error—was in any sense harmless, because his rejection of the treating physicians' opinions is not supported by substantial evidence in the record either. In particular, there are no countervailing or contradictory medical opinions in the record to which the ALJ pointed in support of his wholesale rejection of the treating physicians' opinions. As indicated above, an ALJ must accord "controlling weight" to a treating physician's opinion if that opinion is "well-supported by medically acceptable clinical and

laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). Here, Dr. Ognenovski's diagnosis of fibromyalgia is supported by medically acceptable clinical and diagnostic techniques that pertain to the diagnosis for that particular condition, and his opinion regarding the plaintiff's capacity to perform work-related activities as a result of the symptoms she suffered in connection with her fibromyalgia is not inconsistent with the other evidence in the record. There effectively is no other evidence in the record, besides the plaintiff's own testimony, discussed in greater detail below.

In sum, the ALJ's failure to give good reasons for his rejection of the treating physicians' opinions constituted legal error, apparently stemming from his failure to recognize the plaintiff's fibromyalgia as a "severe impairment." *Cf. Preston*, 854 F.2d at 820 (finding reversible error where the ALJ failed to credit the plaintiff's treating physician's fibromyalgia diagnosis based on the absence of objective medical evidence to support it). Finally, the ALJ's failure to accord controlling—or indeed any—weight to Dr. Ognenovski's assessment of Kalmbach's ability to perform work-related activities was error in light of the fact that the medical opinion was consistent with the overwhelming weight of the evidence in this case, and not contradicted by any other medical evidence in the record.

These errors alone warrant remand, but they are further compounded by the ALJ's inadequately supported assessment of Kalmbach's credibility, as discussed below.

**B.      The ALJ's Evaluation of Kalmbach's Credibility**

The ALJ found that Kalmbach's statements regarding the effect of her impairments on her ability to work were not fully credible.

We have recognized that disability claims related to fibromyalgia are related to the *symptoms* associated with the condition—including complaints of pain, stiffness, fatigue, and inability to concentrate—rather than the underlying condition itself. *Rogers*, 486 F.3d at 247 (citing 20 C.F.R. § 416.929); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 686 (6th Cir. 1992) (noting that subjective complaints of pain may support a claim for disability). Where the symptoms and not the underlying condition form the basis of the disability claim, we employ a two-part analysis in evaluating complaints of disabling pain. 20 C.F.R. § 416.929(a); *Rogers*, 486 F.3d at 247; *Felisky v. Bowen*, 35 F.3d 1027, 1038-39 (6th Cir.1994). First, the ALJ should ask whether the there is an underlying medically determinable physical impairment that could reasonably be expected to produce the claimant's symptoms. 20 C.F.R. § 416.929(a).[3] Second, if the ALJ finds that such an impairment exists, then he must evaluate the intensity, persistence, and limiting effects of the symptoms on the individual's ability to do basic work activities. *Id.* Relevant factors for the ALJ to consider in his evaluation of symptoms include the claimant's daily activities; the location, duration, frequency, and intensity of symptoms; factors that precipitate and aggravate symptoms; the type, dosage, effectiveness, and side effects of any medication taken to alleviate the symptoms; other

---

[3] The ALJ stated that "the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms" (AR 21) but, because he did not list fibromyalgia as a severe impairment, it is unclear whether he took that condition into consideration in assessing Kalmbach's pain allegations.

treatment undertaken to relieve symptoms; other measures taken to relieve symptoms, such as lying on one's back; and any other factors bearing on the limitations of the claimant to perform basic functions. *Id.*; *see also* Soc. Sec. Rul. 96-7p, 1996 WL 374186, at *2-3 (July 2, 1996) (Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements).

The ALJ, of course, and not the reviewing court, is tasked with evaluating the credibility of witnesses, including that of the claimant. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997); *Crum v. Sullivan*, 921 F.2d 642, 644 (6th Cir.1990). However, the ALJ is not free to make credibility determinations based solely upon an "intangible or intuitive notion about an individual's credibility." Soc. Sec. Rul. 96-7p, 1996 WL 374186, at *4. Rather, such determinations must find support in the record. Whenever a claimant's complaints regarding symptoms, or their intensity and persistence, are not supported by objective medical evidence, the ALJ must make a determination of the credibility of the claimant in connection with her complaints based on a consideration of the entire case record. The entire case record includes any medical signs and laboratory findings, the claimant's own complaints of symptoms, any information provided by the treating physicians and others, as well as any other relevant evidence contained in the record. Consistency of the various pieces of information contained in the record should be scrutinized. Consistency between a claimant's symptom complaints and the other evidence in the record tends to support the credibility of the claimant, while inconsistency, although not necessarily defeating, should have the opposite effect.

Social Security Ruling 96-7p also requires that the ALJ explain the credibility determinations in his decision with sufficient specificity as "to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." In other words, blanket assertions that the claimant is not believable will not pass muster, nor will explanations as to credibility which are not consistent with the entire record and the weight of the relevant evidence. And, as the court noted in *Rogers,* "given the nature of fibromyalgia, where subjective pain complaints play an important role in the diagnosis and treatment of the condition, providing justification for discounting a claimant's statements is particularly important." 486 F.3d at 248 (citing *Hurst v. Sec'y of Health & Human Servs.*, 753 F.2d 517, 519 (6th Cir. 1985)).

In the present case, the ALJ's consideration of Kalmbach's subjective pain complaints and assessment of her credibility do not comport with the Administration's requirements. The ALJ's discounting of Kalmbach's credibility was based on (1) the absence of objective medical evidence; (2) the absence of more aggressive treatment; and (3) the ALJ's conclusion that Kalmbach engaged in "essentially normal daily and social activities." (AR 21.) As discussed above, however, the absence of objective medical evidence to substantiate the diagnosis of fibromyalgia or its severity is basically irrelevant, and more "aggressive" treatment is not recommended for fibromyalgia patients. In other words, the first two bases for the ALJ's discounting Kalmbach's credibility are irrelevant. Further, his conclusion that Kalmbach engaged in "essentially normal daily and social activities" grossly mischaracterizes the available evidence.

Kalmbach indeed testified that she went to the grocery store, the pharmacy, and church, and that she was able to prepare her own meals most of the time, and usually able to dress herself without assistance. She was able to drive, but had to limit it to less than thirty minutes per day. These minimal activities are hardly consistent with eight hours' worth of typical work activities. *Cf. Rogers*, 486 F.3d at 248–49 (finding that the plaintiff's daily functions, including her ability to drive, clean her apartment, care for two dogs, do laundry, read, do stretching exercises, and watch the news, were not "comparable to typical work activities" and did not justify the ALJ's discrediting her testimony). Kalmbach also testified that she suffered fatigue and pain basically all the time, that it took very little activity to "wear [her] out" to the point where she could not function or concentrate, and that she did not attempt to undertake more than one activity outside the home on any given day, because doing so would cause a flare-up in her symptoms. (AR 443, 452.) She testified that she spent most of her time sitting with her legs propped up, either reading or watching television. The ALJ's determination that she engaged in essentially normal daily and social activities is not supported by substantial evidence in the record.

Moreover, Kalmbach's testimony was consistent with the available medical evidence. As early as October 2001, Dr. Ognenovski discussed with Kalmbach the possibility of her working fewer hours "as a way of coping with her [fibromyalgia] symptoms and fatigue." (AR 309.) In February 2002, he observed that she was feeling much better and was less fatigued, in large part because she was working reduced hours, though she "of course" continued to take analgesics and muscle relaxants. (AR 310.) Over the next several years, her condition remained basically stable,

but Dr. Ognenovski noted that she periodically experienced flare-ups in her pain symptoms requiring her to increase her medications and rest for periods of three to five days before she was stable again. (AR 314.) These notations substantiate Kalmbach's and both her physicians' assessment that she would be required to be absent from any work she attempted a minimum of three days in any given month. Although Dr. Ognenovski noted in 2003 that it would be better "overall" for Kalmbach to "remain[] functional," *i.e.*, to work if she could, the context of his statements makes it clear he did not mean she should work full time. (AR 320.) And, although Kalmbach continued to work until April 2005, her testimonial evidence, the financial evidence in the record, and her physicians' treatment notes indicate fairly conclusively that she was not working full time for the last few years she worked. (*See, e.g.*, AR 388 (Dr. Ognenovski's treatment note for September 30, 2004, indicating Kalmbach's fibromyalgia was at "baseline," that she "remain[ed] fairly functional" and "continued to work part-time").)

Nor can the fact that Dr. Kalmbach recommended weight loss and exercise be deemed to detract from Kalmbach's credibility. *Cf. Rogers*, 486 F.3d at 249 ("[T]he fact that a patient is encouraged to remain active does not reflect the manner in which such activities may aggravate the patient's symptoms. Notably, Rogers' own treating physicians also recommended that she remain as active as possible, yet this did not alter their opinions as to her functional limitations and work restrictions.").

In sum, while credibility determinations regarding subjective complaints rest with the ALJ, those determinations must be reasonable and supported by substantial evidence. The decision in this

case does not contain specific reasons for discounting Kalmbach's credibility; those reasons that are given are not supported by the evidence in the case record. The ALJ's decision to reject Kalmbach's subjective complaints and their effect on her ability to work is not supported by substantial evidence in the record and constitutes reversible error.

## V.    CONCLUSION

The Commissioner's failure to give good reasons for his rejection of the treating physicians' opinions constitutes legal error, and his ultimate decision to deny Kalmbach's claim for benefits is not supported by substantial evidence in the record.

When, as here, the nondisability determination is not supported by substantial evidence, we must decide whether to reverse and remand the matter for further proceedings or to reverse and order benefits granted. The court has authority to affirm, modify or reverse the Commissioner's decision "with or without remanding the cause for rehearing." 42 U.S.C. § 405(g); *Melkonyan v. Sullivan*, 501 U.S. 89, 100 (1991).

Generally, benefits may be awarded immediately "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994); *see also Abbott v. Sullivan*, 905 F .2d 918, 927 (6th Cir. 1990); *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 782 (6th Cir. 1987). Benefits may be awarded only where the proof of disability is strong, and opposing evidence is lacking in substance, so that remand would merely involve the presentation of cumulative evidence, or where the proof of disability is overwhelming. *Faucher*, 17 F.3d at 176;

*see also Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994); *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985).

Such is the case here. In view of the plaintiff's treating physicians' opinions and the plaintiff's own assertions of disabling pain, stiffness, fatigue, and inability to concentrate, there exists strong evidence that the plaintiff's combined impairments meet or exceed a listed impairment under the Social Security regulations. More critically, there effectively is no opposing evidence, such that remand would merely involve the presentation of cumulative evidence, and a denial of benefits on remand would necessarily be deemed unsupported by substantial evidence in the record. *Cf. Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference.").

We therefore REVERSE the judgment of the district court and REMAND with instructions to the district court to remand the case for an award of benefits.

**BOGGS, Circuit Judge, concurring in part and dissenting in part**. I agree with the majority opinion that the Administrative Law Judge erred in rejecting the opinions of Kalmbach's treating physicians without adequate reason, as that opinion explains. However, I believe that an award of benefits at this time is not warranted, and thus I dissent from the portion of the opinion that remands for an award of benefits, rather than for reconsideration under the proper standard.

I believe that the evidence is sufficiently mixed that it would be within the competence of the Commissioner to decide this case either way under the proper standard.