*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 14a0025p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

—————————————

ERIKA GENTRY,

　　　　　　　*Plaintiff-Appellant,*

　　　v.

COMMISSIONER OF SOCIAL SECURITY,

　　　　　　　*Defendant-Appellee.*

No. 13-5719

—————————————

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 2:12-cv-02577—James D. Todd, District Judge.

Decided and Filed: February 4, 2014

Before: MERRITT, SUTTON, and STRANCH, Circuit Judges.

—————————————

## COUNSEL

—————————————

**ON BRIEF:** Anthony W. Bartels, BARTELS LAW FIRM, LLC, Jonesboro, Arkansas, E. Gregory Wallace, CAMPBELL UNIVERSITY SCHOOL OF LAW, Raleigh, North Carolina, for Appellant. Mary Ann Sloan, Dennis R. Williams, Douglas G. Wilson, Dana L. Myers, Natalie Liem, William L. Hogan, SOCIAL SECURITY ADMINISTRATION, Atlanta, Georgia, for Appellee.

—————————————

## OPINION

—————————————

　　　JANE B. STRANCH, Circuit Judge. Erika Gentry appeals the district court's opinion affirming the decision of the Commissioner of Social Security to deny her disability benefits. Substantial evidence on the record as a whole establishes that Gentry is disabled by multiple physical impairments. Because the Commissioner's decision rejecting Gentry's application is not supported by substantial evidence and is flawed in several respects, we **REVERSE** and **REMAND** for an award of benefits.

1

## I.     FACTS AND PROCEDURAL HISTORY

This case has an extended history before the Social Security Administration that includes two remands and three hearings before an ALJ. Due to the scope and size of the medical record, we begin with an overview of Gentry's medical history. Gentry's primary category of illness is her long history of psoriasis, a chronic autoimmune condition characterized by patches of raised, red skin covered with flaky, white buildup of dead skin cells called "plaques" that can be painful and that crack and bleed. National Psoriasis Foundation, Facts About Psoriasis 1.[1] In the more severe cases, the condition interferes with sleeping, walking, sitting, standing, and using one's hands, especially when the plaques are located on the hands and feet. *Id*. at 2. Gentry also has psoriatic arthritis, an inflammatory disease developed by thirty percent of those with psoriasis that causes generalized fatigue, stiffness and swelling in and around the joints, tenderness, pain and swelling in the tendons, swollen fingers and toes, and reduced range of motion. NPF, Facts about Psoriatic Arthritis 1. It, too, can interfere with use of the hands, sleeping, walking, sitting, and standing. *Id*. at 2. There is no cure for psoriasis or psoriatic arthritis, but many treatments exist in a somewhat tiered system where doctors move from the first-line treatments to the more high-risk medications as the severity of the conditions increases and the response to first-line treatments decreases. *See generally*, NPF, Psoriasis, Treatments.

Gentry also has severe injuries in her left ankle, right arm and wrist, and right hip resulting from a 1994 car accident. Eventually, she developed avascular necrosis and post-traumatic arthritis in her left ankle, eventually losing ankle movement, and post-traumatic arthritis in her hip. She requires a metal brace on her left leg to walk, walks with a limp and waddling gait, stands up with stiffness, and has frequent pain in her left leg and foot, low back, neck, and hands. In addition, she has been diagnosed with

---

[1]The record includes general information on psoriasis and psoriatic arthritis from the National Psoriasis Foundation (NPF), all of which can be found on the NPF website. The record also includes references to the NPF website at www.psoriasis.org. The Facts About Psoriasis document can be found at https://www.psoriasis.org/document.doc?id=1492. The Facts About Psoriatic Arthritis document can be found at https://www.psoriasis.org/document.doc?id=1493. All other information from the NPF website can be found by navigating from the home page at www.psoriasis.org. When citing to the NPF herein, the name of the particular page on the website where the information can be found is provided.

deformities in her foot, ankylosing spondylitis cervical radiculopathy, cervical stenosis, lumbar spondylosis, possible sacroilitis or facet arthropathy in the low back, degenerative joint disease in the low back, chronic lumbar strain, possible herniated disc, carpal tunnel syndrome, and lumbosacral/thoracic radiculopathy, among other things. She has been prescribed many medications over the years, including the higher-tiered psoriasis medications, most of them with limited or temporary success.

In June 2004, Gentry filed an application for disability benefits under Title II of the Social Security Act, 42. U.S.C. §§ 401 *et seq*, alleging disability since June 7, 2004. At the time, she was twenty-nine years old with a high school education and some college. She had worked approximately 10 years as a pizza maker and a pizza delivery driver. She had most recently worked as a receptionist at a chiropractor's office but had been discharged after 2 months because she bled on the paperwork due to her plaques from psoriasis.

After Gentry's application was denied, the case was remanded twice for further proceedings. The first time, the district court granted the unopposed motion of the Commissioner to remand. The second time, the Appeals Council remanded with instructions for the Administrative Law Judge (ALJ) to complete the administrative record, to consider medical evidence through 2009 including the January 2009 treating source opinion of Dr. Andrew Murphy, to revisit its assessment that Gentry's impairments had not changed since the first ALJ decision in 2006, to provide an adequate rationale to support the physical residual functional capacity (RFC) assessment, and to correct the incongruous finding that Dr. Murphy's assessment was consistent with a sedentary residual capacity when Dr. Murphy said that Gentry cannot sit for long periods of time. The Appeals Council instructed the ALJ to request further clarification from the treating physician if necessary.

An ALJ held a third hearing in September 2011. Afterward, the ALJ issued a November 2011 decision denying Gentry's application for benefits at the fourth step of

the required disability analysis. *See* 20 C.F.R. § 404.1520(a) (2011).[2]  The ALJ found

that although Gentry was disabled in 2011, she did not qualify for disability benefits

prior to the last insured date of December 31, 2009.  The ALJ found that Gentry did not

have an impairment that met the severity of the listed impairments in 20 C.F.R. Part 404,

Subpart P, Appendix 1 and that Gentry had the residual functional capacity (RFC) to

perform past relevant work as a receptionist.  The Appeals Council declined jurisdiction,

and the district court affirmed.

Gentry now seeks review in this court, contending that her psoriasis and psoriatic

arthritis meet the requirements for a disability listing under Appendix 1 and that the ALJ

ignored objective medical evidence of the severity of these conditions in step three of

the analysis.  Gentry also argues that the ALJ erred at step five of the analysis by failing

to give controlling weight to the opinion of her treating physician that she cannot sit for

prolonged periods of time when objective medical evidence supports this opinion.  The

following lengthy discussion of the facts captures the salient information from the

voluminous administrative record.

A.      **Early Medical History**

In 1994, Gentry first saw Dr. James Turner, a dermatologist, for "painful

uncomfortable lesions" on the scalp and shoulder.  Dr. Turner diagnosed "Pustular

Seborrhea"[3] and prescribed an antibiotic, erythromycin, and some topical medications.

Gentry returned to Dr. Turner years later for psoriasis-related problems, but in the

meantime, she received treatment elsewhere for more pressing medical needs resulting

from a serious car accident.

---

[2]The version of the rules in effect in November 2011, when the ALJ rendered her opinion, applies.  For clarity, where the rules have been moved or have changed in substance since that time, it is noted.

[3] Seborrheic dermatitis and pustular dermatitis are broader categories of dermatitis that psoriasis falls into.  Seborrheic Dermatitis, expertconsultbook.com, http://www.expertconsultbook.com/expertconsult/ob/book.do?method=display&type=bookPage&decorator=none&eid=4-u1.0-B978-1-4377-0314-6..00010-3&isbn=978-1-4377-0314-6 (last visited Dec. 20, 2013).

On May 22, 1994, at the age of nineteen, Gentry was treated in an emergency room after a head-on car collision. She suffered fracture dislocations of the right hip and the left ankle, fracture of the right distal radius, fracture of the right wrist, and miscarriage of her 33-week old fetus. Gentry underwent multiple surgeries and afterward continued to have problems including restrictions against bearing weight on her lower extremities.

Over the next two years, Gentry received ongoing post-operative treatment from Dr. William Jameson, an orthopedic surgeon at the Orthopaedic Clinic, seeing him a total of fifteen times by March 1996. Gentry developed avascular necrosis (death of bone tissue that can lead to the bone's eventual collapse) and collapse of the left talar dome (the top of the ankle joint) and was ordered to wear either a Bledsoe boot or patella tendon bearing brace for some time, to unload weight from her foot and ankle area. Over time, Dr. Jameson noted a continuing need for the brace and concerns about the neck and ankle areas, but Gentry generally improved. By June 1995, Gentry had mild pain over one of the screws, limitations in the subtalar motion in her ankle, and some underlying subtalar arthritis, but Dr. Jameson reported that she had probably reached "maximum medical improvement."

In April 1996 and 1997, Gentry saw both Dr. Jameson and his colleagues a number of times, for a twisting injury to the left ankle that prevented Gentry from standing or walking for long periods; for a large callus, which "may be related to the foot stiffness secondary to her previous massive foot trauma;" and for pain and tenderness in the wrist that had been ongoing for three weeks. Dr. Jameson indicated that Gentry still had some components of avascular necrosis of the talus and had permanent limitations related to her car accident injuries: "combined impairment for her fracture dislocation of the ankle with associated talar neck fracture is 10% of the whole person, 22% of the lower extremity and 30% of the foot." Dr. Jameson paired down the lesion and recommended a wrist immobilizer. In 1998, after Gentry was involved in another car accident and treated in an emergency room, she began to see Dr. Lynn Stegall, a colleague of Dr. Jameson, for pain and tenderness in the left knee, left ankle, and right

hip and for a sprain in her ankle. Over the next couple of years, Gentry both called Dr. Jameson and visited him in the office complaining of pain in her ankle, possibly related to the cold weather and to the fact that she was on her feet all day at work; he prescribed Vioxx.

During this period, Gentry was still seeing Dr. Turner, the dermatologist who had diagnosed her with psoriasis. At first, she was prescribed topical medications, a first line psoriasis treatment, and then a steroid injection of Aristocort was added. NPF, Facts about Psoriasis 2; NPF, Psoriasis, Treatments, Topical Treatments. In 2000, Gentry saw Dr. Turner several times with psoriasis that was "moderate to severe" with "[e]xtensive, large plaque psoriasis of extensor areas, hips and scalp," some "actually getting in and around the eye." She began taking Methotrexate, which was originally used by cancer patients and is now used for those with "moderate to severe psoriasis and psoriatic arthritis" who do not respond to first line treatments. NPF, Psoriasis, Treatments, Traditional Systemic Medications; NPF, Psoriasis, Treatments, Systemic Medications: Methotrexate. Methotrexate increases the risk of infection as well as risks to the liver and kidneys, and these risks are higher for those who are obese or have diabetes. *Id.* By the end of 2000, the psoriasis was responding to treatment, but Gentry still had "[g]eneralized scattered, psoriasiform plaques," and Dr. Turner thought it necessary to continue her on the Methotrexate.

### B.        Medical History: 2001–2005

Around 2001, Gentry's medical record became far more complicated as her diagnoses and her doctors increased in number. After falling in the shower in 2001, Gentry saw Dr. Cole, another doctor at the Orthopaedic Clinic, who noted that Gentry was positive for arthritis, had pain in the right hip, tenderness with certain rotations, mild swelling, and that she has traumatic trochanteric bursitis.[4] Gentry had recently stopped

---

[4]Trochanteric bursitis is inflammation of the sacs of fluid that cushion the areas between tendons and bones. Trochanteric Bursitis – Topic Overview, WebMD, http://www.webmd.com/pain-management/tc/trochanteric-bursitis-topic-overview (last visited Dec. 20, 2013).

taking Vioxx as it had not been helpful, and Dr. Cole prescribed Vicodin, a habit forming drug containing hydrocodone, and instructed Gentry to use it sparingly.

Also in 2001, Gentry saw Dr. David Dowling, with Spine Memphis. Dr. Dowling's notes contain extensive information on Gentry's physical state: back pain radiating into her right leg to the knee; pain with forward flexion; burning, shooting pain that grew worse with exercise or walking and sitting and interfered with her sleep; some numbness; and "psoriatic skin lesions throughout both her elbows and knees and into her shins." He assessed probable discogenic radiculitis,[5] previous hip dislocation and ankle reconstructions, and psoriasis. He placed her on a Decadron taper,[6] prescribed Celebrex,[7] and started her on an extensive physical therapy program. Dr. Dowling's 2003 notes indicate: persistent neck and right shoulder girdle pain; sharp and burning pain that interfered with sleep; and stabbing pain across the lumbosacral junction, near the small of the back. He assessed chronic, cervical facetogenic[8] pain; possible SI (sacroiliac) joint mediated chronic right low back and gluteal pain; and noted that he did not see evidence of the underlying disc pathology that he has previously assessed. He noted that Gentry had previously done home exercises rather than formal therapy and he prescribed a "couple sessions" to set Gentry up on a home therapy program.

During 2003, Gentry again began seeing Dr. Jameson, the orthopedic surgeon, for pain in her forefoot, hindfoot, and hip. Examinations showed that she had very little ankle motion, no subtalar motion, cock-up deformities of her lesser toes, a cavus foot deformity, very prominent metatarsal heads, and pain on extreme motion of the hip.

---

[5]Radiculitis is an infectious disease of the spinal roots. Radiculitis, Survinat, survinat.com/2012/06/radiculitis-2/ (last visited Jan. 12, 2014).

[6]Decadron is a corticosteroid used to treat, among other things, "severe inflammation." Decadron, Drugs.com, www.drugs.com/cdi/decadron.html (last visited Jan. 12, 2014).

[7]Celebrex is used to treat various forms of arthritis and carries serious cardiovascular and gastrointestinal risks. Celebrex, RxList, www.rxlist.com/celebrex-drug htm; Celebrex Indications, RxList, www rxlist.com/celebrex-drugs/indications-dosage htm (last visited Jan. 12, 2014).

[8]Facetogenic pain originates in the facet joints of the spine, which are surrounded by cartilage, soft connective tissue, and a sac of fluid. Facetogenic Pain, Laser Spine Institute, www.laserspineinstitute.com/articles/facetogenic_articles/pain/289/ (last visited Jan. 12, 2014).

Xrays showed mild degenerative changes of the calcaneal cuboid and talonavicular joint, severe changes in the subtalar and ankle joint, and probable avascular necrosis of the talus. Dr. Jameson discussed the possibility of several extensive surgeries to Gentry's ankle, but said he was not certain the surgeries would help. He ultimately determined that protective measures could be taken for the hip and that the forefoot seemed to be helped by orthotics, but said that the hindfoot might need to be addressed later by the surgical insertion of a rod.

Perhaps the most significant development in the record in 2003 was the alteration in Gentry's psoriasis treatments and diagnosis. By 2001, although Gentry continued taking Methotrexate, she still had "[e]rythematous plaques on the elbows and knees," and was reporting some side effects of nausea; in 2003, Dr. Turner began considering other options. In June 2003, Gentry went to see Dr. Turner with "[g]eneralized scattered, plaque psoriasis, pretty much head to toe, with large lesions of the central portion of the torso and arms." Her flare up was "even going to the face." Gentry also had "a great deal of difficulty with joint problems with morning stiffness and difficulty in ambulation, difficulty working." For the first time, Dr. Turner diagnosed severe psoriasis with psoriatic arthritis.

By July, Gentry was "having a lot of pain, peeling and itching." Dr. Turner noted several adverse side effects Gentry had from the Methotrexate, including cold sweats and nausea, and instead started her on Enbrel injections, with special instructions and warnings, and continued her on topical treatments. Enbrel falls within a line of drugs called "biologics," which are grown from live tissue and which attack the immune system. Biologics are prescribed to those with "moderate to severe cases of psoriasis and psoriatic arthritis . . . who have not responded to or who have experienced harmful side effects from other treatments." NPF, Psoriasis, Treatments, Moderate to Severe Psoriasis: Biologic Drugs. Such drugs carry risks of infection, and may not be used by those with a compromised immune system or an active infection. *Id.* Other side-effects include everything from night sweats, nausea, and bruising, to bleeding, skin infection,

and joint pain.  *See*, *e.g.*, Enbrel, Drugs.com, http://www.drugs.com/enbrel.html (last visited Dec. 19, 2013).

Enbrel worked at first.  In early August 2003, the plaque psoriasis was responding "extremely well," but Gentry continued to have "joint discomfort that had not improved as much as we had hoped."  Additionally, Gentry was having "some adverse events which possibly may or may not be associated with the Enbrel which includes some chronic fever blisters, acid reflux, and joint discomfort."  Dr. Turner prescribed Valtrex for the cold sores and continued her on Enbrel.  By the end of August 2003, however, Dr. Turner instructed Gentry to hold the Enbrel because she had a tooth abscess that needed to be treated with antibiotics.  In October 2003, Dr. Turner put Gentry back on Enbrel, but with hesitations.  She had stopped taking it because she had been having gum problems and because she was having oral procedures associated with her accident.  Dr. Turner restarted the Enbrel, with Percoset, a narcotic containing oxycodone, for the gum problems, but told her to stop taking it if the problems continued.

Over the next few months, Gentry was off and on Enbrel while she was treated by others for ear infections, bronchitis, vomiting, chills, GERD (chronic gastroesophageal reflux disease), and depression.  In May 2004, Dr. Turner noted that Gentry had stopped taking Enbrel, as previously instructed, due to the gum infections.  At the time, Gentry's psoriasis was "moderate to severe," she continued to have psoriatic arthritis, and Dr. Turner noted that a biologic drug was warranted.  However, he could not restart her on Enbrel until after some pending oral surgeries.  He wrote a prescription for later Enbrel injections as well as more Percoset and topical treatments.

This time, the Enbrel worked less well.  In June 2004, Gentry's psoriasis continued to be "moderate to severe with ISRs and some slight bruising," and "even the arthritis has not improved."  Gentry was also having reactions to the injection site.  Dr. Turner continued Gentry on the Enbrel in hopes that she would improve.  Around the same time, Gentry was also diagnosed with insulin resistance and impaired glucose tolerance, and prescribed Metformin.

Meanwhile, Gentry continued seeing various doctors for her pain symptoms. She saw Dr. Jameson, the orthopedic specialist, again in March 2004, with significant pain in her ankle, subtalar joint, and mid foot. He diagnosed arthritic hindfoot in the ankle and subtalar joint with an equinus contracture and varus forefoot. He again tried orthotics and suggested that significant surgeries, involving the insertion of rods and fusion of joints, may be warranted but would be a significant undertaking. A couple of months later, Gentry called complaining that "she doesn't know what she is going to do about the pain" and that "she has got to have some relief."

By the end of 2004, Dr. Jameson's exams showed that Gentry had an "exquisitely tender" foot and ankle that produced a severe reaction to just a light touch and that her foot and ankle lacked any significant motion. He described the problems with her foot as "progressive." Xrays showed severe arthrosis of the ankle joint, probably previous avascular necrosis of the talus, and advanced arthritic changes in the subtalar joint. Dr. Jameson again discussed a serious two-part surgical option, but explained that there was no guarantee it would solve her problems, that she would continue to have a grossly abnormal foot, that rehabilitation would be required, and that it produced risks including deep infection and problems that could threaten her life or limb. Dr. Jameson noted a comment from Gentry's mother, who had accompanied her to the appointment, suggesting that there was a psychological component to the pain because Gentry had done well after the car accident. Dr. Jameson said that he was "not sure why she made that comment," but that he would like to rule out the possibility of a psychological component as well as reflex sympathetic dystrophy before operating. He also referred Gentry to Dr. Moacir Schnapp, a pain specialist at the Mays & Schnapp Pain Clinic and Rehabilitation Center.

Gentry saw Dr. Schnapp for the first time in November 2004. Dr. Schnapp evaluated the various sources of Gentry's pain, including her hip, psoriatic arthritis, and foot, which had caused increased pain over the past few years to the point where she would "see[] stars" if it hit anything. His notes indicate that Gentry had tried multiple medications with no relief, she was insisting on surgery from Dr. Jameson, and she had

been unable to continue Enbrel due to recurring infections. His exam showed that Gentry was moderately obese, stood up with difficulty, limped, had allodynia with hyperpathia on the dorsum of the foot, and had some hypesthesia distally in both feet. Dr. Schnapp reported that he did not think surgery would be the best choice because it would help only with the mechanical pain and not with the neuropathic components and instead tried her on Lidoderm patches, Topamax,[9] and a somatic/sympathetic block.[10] These medications helped, but were not enough. Gentry continued to have aching and sharp pain in her leg and occasional severe bouts of pain accompanied by a lightning sensation and nausea. He administered a left sciatic nerve "block" in an operating room multiple times through June 2005.

Despite these pain treatments, Gentry continued seeing her other doctors for pain-related symptoms. She saw Dr. Dowling, now with OrthoMemphis, three times in 2005, beginning in July. At this time, she had chronic neck pain that was progressively getting worse; weakness in the right hand; burning, sharp pain that was worse with sitting, standing or coughing; stiffness; and symptoms that interfered with her sleep. The exam showed that Gentry had tenderness across the lower cervical spine and in the gluteal region, and Xrays showed some spondylitic change at C5-6 and underlying psoriatic arthritis. During the next visit, Dr. Dowling diagnosed chronic cervical pain, psoriatic arthritis, and sacroilitis. He indicated that the cervical pain had increased over the past months and was aggravated by cervical rotation, that Gentry had limited range of motion in the spine when sitting, and that her pain was greater on the left side near C4-C5 and C5-C6. Dr. Dowling discussed with Gentry the possibility of inflammatory spondyloarthropathy[11] with psoriatic arthritis, and discussed treating with interventional

---

[9]Topamax is normally prescribed for epilepsy and migraines. Topamax, RxList, www rxlist.com/topamax-drug/indications-dosage htm (last visited Jan. 12, 2014).

[10]Somatic and sympathetic nerve blockades, which are administered by epidural, block certain nerves leading to the back. Somatic and Sympathetic Nerve Blockade, coccyx, www.coccyx.org/medlabs/zapp htm (last visited Jan. 12, 2014).

[11]Inflammatory spondyloarthopathy is a group of rheumatic diseases, which are caused by inflammation, pain and swelling in the joints and muscles, that affects the joints in the spine. Inflammatory Spondyloarthropathy Symptoms and Causes, North Shore Orthopaedic Institute, www northshorelij.com/orthopaedics/en/conditions-treatments/inflammatory-spondyloarthropathy.

injections and a sacroiliac belt. On Dr. Dowling's recommendation, Gentry attended physical therapy sessions over the next two months and was discharged to continue home therapy. Afterward, Dr. Dowling reported some improvement in her neck but more significant SI joint region pain. The pain in the right buttock was worse with standing or walking. For the first time in August 2005, Dr. Dowling put some of Gentry's various diagnoses together, assessing right SI joint pain with underlying psoriatic arthritis and chronic neck pain with underlying cervical spondylosis. He determined that he would wait to provide further treatment until he could see how Gentry's new psoriatic arthritis treatments, discussed below, would progress.

In mid-2005, Gentry began seeing a new dermatologist, Dr. Rosenberg, at the Dermatology Clinic for "disabling" psoriatic arthritis and psoriasis that had not responded well to Enbrel. Dr. Rosenberg recommended that she discuss Humira and Bicillin with Dr. Jane Alissandratos, who should be the primary source of care for this. Dr. Allisandratos, a rheumatologist, also began seeing Gentry for joint pain that had "progressively gotten worse" from psoriatic arthritis in the neck, back, right knee, left ankle, and right wrist as well as diabetes. Dr. Alissandratos reviewed records from Dr. Dowling and others and started Gentry on Humira injections, another type of biologic drug similar to Enbrel, and Bicillin, an injectable form of penicillin. NPF, Psoriasis, Treatments, Moderate to Severe Psoriasis: Biologic Drugs; Bicillin CR, RxList, http://www.rxlist.com/bicillin-c-r-drug.htm (last visited Jan. 12, 2014). At first the Humira improved the psoriasis, but Gentry continued having pain and swelling in her hands and left foot, and pain in the lower back, neck, and jaw. By October, she was having continued joint pain in the right wrist, left knee, low back, and neck as well as a severe breakout of psoriasis. Dr. Alissandratos increased the Humira injections. At the end of the year, Gentry had experienced some improvement in the psoriasis but not the joint pain, and she was having side effects from the various medications, including diarrhea, poor sleep, and shortness of breath.

###    C.        **Medical History: 2006–2008**

Gentry continued to see her cadre of doctors for progression of her conditions over the course of the next three years.  Her psoriasis and psoriatic arthritis worsened and remained resistant to treatment.  In March 2006, Dr. Alissandratos reported that significant skin lesions had appeared in new places, with significant patches on Gentry's extremities and trunk.  In May, the psoriasis and psoriatic arthritis was "worse since last visit" despite Gentry being on Humira; she had pain in her hands, back, and knees; and she had synovitis.[12]  Later that year, Dr. Rosenberg, the dermatologist, decided to try Bicillin again.  Afterwards, the psoriasis returned, so he tried Bicillin a third time in January 2007.

That January, Dr. Alissandratos saw Gentry for swelling in her hands, joint pain, and increasing psoriasis flare-ups.  At this point, Gentry had stopped taking Humira because she was "scared of it," but Dr. Alissandratos provided more Bicillin shots.  In March 2007, Dr. Rosenberg reported that Gentry's psoriatic arthritis was painful and that she still had patches despite the Bicillin.  He increased the Bicillin and considered adding Remicade.  Remicade is an injectable drug made from human antibodies that carries serious risks of infection.  Remicade, RxList, http://www.rxlist.com/remicade-drug.htm (last visited Jan. 12, 2014).

That summer, Dr. Rosenberg thought Gentry was "not well, but better."  He said that when Gentry took shots, the psoriasis responded but did not go away.  But in October 2007, Dr. Alissandratos reported that Gentry was having severe low back pain, worsening joint pain in her right leg, swelling in her hands, numbness and tingling in her hands and left ankle, and worsening psoriasis in her scalp, elbows, knees, and hands.  She noted that Gentry was unable to see Dr. Rosenberg anymore and was looking for a new dermatologist.  Gentry eventually returned to Dr. Turner, the dermatologist, in December of 2008 for moderate to low severity psoriasis on her thighs, lower

---

[12]Synovitis is the "inflammation of the synovial (joint-lining) membrane, usually painful, particularly on motion, and characterized by swelling, due to effusion (fluid collection) in a synovial sac." Synovitis, Health Central, www.healthcentral.com/encyclopedia/408/628 html (last visited Jan. 12, 2014).

extremities, hands, nails, and scalp; ankylosing spondylitis; and other "serious psoriatic type issues." Dr. Turner said that Gentry was "pretty much disabled with psoriasis," and decided that, in light of previous complications with the higher risk drugs—Enbrel, Humira, and methotrexate—he would try light therapy. "Phototherapy," a process of aiming UV light and lasers at the skin, is another first-line treatment for psoriasis. NPF, Facts about Psoriasis 2; NPF, Psoriasis, Treatments, Phototherapy.

Gentry also continued to see Dr. Schnapp, the pain specialist, between 2006 and 2008. In 2006, Dr. Schnapp saw Gentry several times for recurrent hip pain; an aching, throbbing, sharp pain in her left foot; pain in her back; stiffness; sciatica; and severe limping. He attributed much of her pain to the underlying psoriatic arthritis. He noted some bad side effects from prior medications and prescribed Percocet for the occasional severe pain, but he generally deferred to the treatments that Gentry was receiving from Dr. Alissandratos. When Gentry had not been able to tolerate the Percocet, he put her on Darvocet, a different but also habit forming narcotic.

In the spring of 2007, Dr. Schnapp said that Gentry's psoriatic arthritis was causing pain that was "aching, throbbing, sharp, worse with just about any kind of activities" despite the treatments she was receiving from Dr.s Alissandratos and Rosenberg. He said that he did "not have anything better to offer her at the present time." Two months later, Gentry had a substantial increase in her left ankle pain, swelling, and discoloration, causing her to have trouble putting it down. In August, the "psoriasis [wa]s still intense and so [wa]s the arthritis" even though she was "doing well with the present medication." Gentry was also having more problems with her left foot, and Dr. Schnapp diagnosed lumbosacral/thoracic radiculopathy.[13] Soon after, he referred Gentry to Dr. Harry Friedman, a neurosurgeon.

Dr. Friedman reported chronic left lower extremity pain in the leg despite an ankle brace (prescribed by Dr. Murphy and discussed in more detail below), chronic

---

[13]Thoracic and lumbar radiculopathy refer to impinged nerve roots in the middle or lower part of the spine. Thoracic Radiculopathy, www.laserspineinstitute.com/back_problems/radiculopathy/thoracic (last visited Jan. 12, 2014).

right hip pain, a tingling sensation in the toes, and constant low back pain and tenderness at L5-S1. A CT scan confirmed degenerative joint disease at L5-S1; a lumbar myelogram showed a shallow disc bulge at L4-5; and Dr. Friedman diagnosed chronic lumbar strain and possible herniated disc. In November, he reported intermittent neck pain and occasionally deep lumbar pain, and said that the brace on her lower extremity "produced increased lower back pain." By January 2008, Gentry was diagnosed with carpal tunnel syndrome. A CT scan of the spine also showed that she had severe right neural foramina narrowing at C5-6 and a broad-based disc osteophyte bulge at C3-4. Throughout early 2008, Dr. Friedman continued to report that Gentry was having neck pain, weakness and severe pain in her right shoulder, and numbness and weakness in her arms and hands despite the exercises and medications, and he added cervical stenosis to the list of diagnoses. Gentry had surgery for carpal tunnel syndrome in April of 2008.

In October 2008, Dr. Friedman sent Gentry to physical therapy for her back pain. The physical therapist's notes indicate that Gentry had 50% loss of extension in her lumbar motion and increased pain with standing or lying face up, but lower pain while lying face down. The functional status notes say that pain prevented walking more than a quarter of a mile, standing more than 10 minutes, sitting more than 10 minutes, and sleep without medication. The functional goals of physical therapy were, in part, to increase Gentry's tolerance to walk a quarter of a mile with fewer symptoms and to increase her tolerance for sitting and standing to 20 minutes with fewer symptoms. The physical therapy notes do not indicate a significant improvement in pain before Gentry completed the program.

Meanwhile, Gentry continued to see Dr. Schnapp for cervical radiculopathy, lumbar spondylosis, and psoriatic arthritis. She continued to have decreased dorsiflexion of the foot despite the ankle brace. At the end of 2008, Gentry continued to suffer low back pain, possibly from sacroilitis or facet arthropathy, and she had active psoriasis, and decreased range of motion in her lumbar spine.

D.	**Consultative Exams**

Throughout the course of this litigation, Gentry underwent multiple consultative examinations.  In November 2004, she received her first consultative disability exam from Dr. Paul Katz with Tennessee Disability Determinative Services.  Dr. Katz then observed pain, scars and deformities on the left ankle, no motion in the left ankle, walking with a slight limp, and had opined that "[t]his may impair her ability to walk, lift and carry."

In January 2006, Gentry received an exam from Dr. James Galyon, also with Tennessee Disability Determinative Services.  Dr. Galyon's exam revealed continuation of the same symptoms.   She had "extensive reddish scaly lesions over the metacarpophalangeal joints of both hands over the wrist primarily on the right and over extensive surface of the elbows" and over both knees.  He said she had "obvious psoriasis and psoriatic arthritis which weakens both hands and causes pain in both hands, knees, and back."  He believed she was on appropriate medication for this but that "it seems not to be offering her a good bit of relief."  Gentry walked with a "severe limp" and "waddling gait indicative of right hip weakness."  Her hip abduction was limited and weak, and had post-traumatic arthritic changes "causing pain on weight bearing and standing and walking."  Gentry's ankle had a five degree vargus deformity in the ankle and a frozen subtalar joint. Dr. Galyon attributed these limitations to "major orthopaedic residuals from [the] motor vehicle accident" "plus other systemic disease" including psoriasis and psoriatic arthritis.

As for her work-related limitations, Dr. Galyon said that Gentry had significant restrictions in her ability to lift or pull because of the stress on her ankle and hip, and that she would be able to lift a maximum of ten pounds.  He said that she would not be able to climb, kneel, crouch, or crawl.  He thought that Gentry would be able to stand and walk up to two hours in an eight-hour work day, but he did not find any significant impairment in sitting.  Nevertheless, Dr. Galyon opined that the limitations were "permanent and more than likely progressive."  He did not say whether there would be any work-related limitations due to the exposed psoriatic lesions.

In 2008, Dr. Robert Doster provided another consultative report. Dr. Doster opined that Gentry could lift 10 pounds, could stand or walk 2 hours in an 8 hour day, could sit 6 hours in an 8 hour day, but could not push or pull.

Gentry's last consultative exam occurred in 2011, after her last insured date, and was provided by Dr. Randall Wisdom. Dr. Wisdom reported that Gentry had large psoriatic plaques on her legs, torso, and extremities, as well as bleeding plaque fissures on her hands. She had spine pain and stiffness due to the psoriatic arthritis, though she had ceased the stronger pain medications because they impaired her mentally. She also had multiple joint pains, especially in the ankle, due to complications arising out of the 1994 car accident, and she wore a metal leg brace. Gentry's daily activities included some light house work, but no ironing, mopping, or laundry. She could drive for up to 30 minutes, could walk for a quarter mile, and could stand for 15 or 20 minutes. She could sit for up to half an hour, and had a weak grasp due to psoriasis related sensitivity.

### E.        Treating Physician Opinion As to Work-Related Limitations

Finally, there is Dr. Andrew Murphy, an orthopedic surgeon with the Campbell Clinic whom Gentry began seeing in mid-2007. Gentry was referred from Dr. Schnapp, who wanted a specialist to take another look at Gentry's ankle. Dr. Murphy reviewed her treatment history from Dr. Schnapp as well as Dr. Jameson, her previous orthopedic surgeon whom Gentry had stopped seeing due to changes in her insurance. He diagnosed post-traumatic avascular necrosis with arthrosis of the ankle and hindfoot. He discussed possible surgery to the ankle, but he did not think it would help the neurogenic pain[14] and said that "it would not be completely unreasonable for her to consider a below the knee amputation." For the time being, he fitted Gentry for a special brace, which seemed to be helping with the ankle pain by April 2008.

---

[14] "Neuropathic pain is a complex, chronic pain state that usually is accompanied by tissue injury. With neuropathic pain, the nerve fibers themselves may be damaged, dysfunctional, or injured. These damaged nerve fibers send incorrect signals to other pain centers." Neuropathic Pain Management, WebMD, www.webmd.com/pain-management/guide/neuropathic -pain (last visited Jan. 12, 2014).

On January 13, 2009, Dr. Murphy wrote a letter in support of Gentry's social security application.  He said that "Ms. Gentry has been a patient of mine since June 27, 2007 and it is my medical opinion that due to her medical condition she is unable to stand, walk or sit for long periods of time.  Due to the condition of her leg, bracing is necessary which also compromises her back."

### F.       Administrative Proceedings

At the administrative hearing at issue, Gentry testified about her psoriasis and psoriatic arthritis, about how she had tried "every drug I can for it" and about how these treatments didn't stop the progression of the illnesses. She said that she did not want to die from complications with these medications.  The ALJ said "the problem is that I need medical records that support that, the progression of the disease and the fact that treatment is not working."  The ALJ observed that Gentry had a visible psoriasis outbreak during the hearing, and Gentry responded that this was "calm."  She testified that sometimes the breakouts cover her entire body, that she bleeds everywhere, and that she doesn't wear a bra unless she goes out in public because it's quite painful, noting that she would have blood rings when she got home after the hearing.  She said that the psoriatic arthritis had settled in the base of her spine and described the surgeries associated with her car accident, the carpal tunnel release, and her ankylosing spondylitis.  She said that she had continual pain and swelling in her leg, foot, and hip, and that she was having arthritis in her fingers.

Gentry also testified about her work history and daily activities.  She had worked as a pizza delivery driver and in other food service jobs for 10 years after her car accident.  She didn't stop working there until the arthritis started progressing.  She had most recently worked as a receptionist at a chiropractor office in 2004.  She had been let go after 2 months because her psoriatic lesions were bleeding on the paperwork and Xrays.  She testified that if she could work, she would, but that her body is unreliable and she would get fired because of the bleeding.  At the time of hearing, Gentry lived with her husband and her adopted son.  She did not work.  She testified that she could

not stoop, kneel, crawl, run, or jump, and had trouble performing household responsibilities with her hands.

The ALJ discussed Gentry's RFC throughout the hearing. The ALJ noted that, according to the 2011 RFC from Dr. Wisdom, Gentry was disabled. She referred to one of the 2008 records from the pain clinic indicating that Gentry could occasionally lift 20 pounds, frequently lift 10 pounds, stand walk and sit up to 6 hours per day. The ALJ said "the most I have" that could preclude sedentary work is the 2009 report from Dr. Murphy, one of Gentry's treating physicians, indicating that she could not do any prolonged standing, walking, or sitting, but said "that gets us prior to the last insured date" of December 31, 2009. Oddly, the ALJ then concluded that the 2009 report "would not preclude sedentary work." The ALJ failed to discuss the bleeding and arthritis in Gentry's hands in regard to the RFC.

The ALJ then examined the "VE" or vocational expert. The VE agreed that the 2011 report showed that Gentry was disabled. The ALJ referred the VE to the 2006 report by Dr. Galyon, the SSI consulting physician, which said that Gentry could walk and stand for only 2 hours per day but that sitting was not affected, and asked about whether Gentry could return to past relevant work. The VE opined that this RFC would not preclude Gentry from sedentary work as long as the job did not involve any pushing or pulling, climbing kneeling, crouching, or crawling, and no more than minimal balancing or stooping. According to the VE, under the RFC based on the 2006 report provided by the ALJ, Gentry could return to work as a receptionist or accounts payable clerk.

In a written decision filed on November 8, 2011, the ALJ employed the governing five-step sequential analysis and denied benefits at the fourth step. *See* 20. C.F.R. § 404.1520(a) (2011) (amended 2012). At step one, she found that Gentry met the insured status requirements through December 31, 2009, and that she had not engaged in substantial gainful activity since June 7, 2004, the alleged onset date. At step two, she found that Gentry suffered from the following severe impairments that significantly limit her ability to do basic work activities under 20 C.F.R. § 404.1520(c):

1) remote history of a vehicle accident with current status of post open reduction internal fixation of the left talar neck, open reduction internal fixation of the medial malleolus, arthrotomy of the right hip, and irrigation debridgement of the right knee lacerations; 2) cervical spondylosis; 3) psoriasis and psoriatic arthritis; 4) obesity; and 5) history of carpal tunnel syndrome with current status of post right carpal tunnel release. Without any additional analysis, the ALJ concluded at step three that Gentry did not have a condition that met one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. In determining Gentry's RFC at step four, the ALJ concluded that Gentry's complaints of pain, limitations in sitting, and bleeding were not fully credible and that she retained the ability to perform sedentary work. Because this included Gentry's past relevant work as a receptionist, the ALJ concluded Gentry was not disabled prior to her last insured date. Because the ALJ's analysis ended at step four, she did not consider under step five whether other jobs exist in the economy that Gentry could perform given her RFC.

## II.     STANDARD OF REVIEW

We review de novo a district court's decision concerning a social security benefit determination. *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir.2011). The Commissioner determines whether a claimant is disabled and entitled to benefits, 42 U.S.C. § 405(h), and our review of this decision "is limited to determining whether it is supported by substantial evidence and was made pursuant to proper legal standards," *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Substantial evidence is less than a preponderance but more than a scintilla; it refers to relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Id.* "An ALJ's failure to follow agency rules and regulations 'denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record.'" *Cole*, 661 F.3d at 937 (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009)).

### III.     ANALYSIS

The Social Security Administration has established rules for how an ALJ must evaluate a disability claim and has made promises to disability applicants as to how their claims and medical evidence will be reviewed. The ALJ's analysis of Gentry's disability claim is flawed in several respects, the primary errors being the ALJ's failure to consider objective medical evidence and treating physician opinions as to the severity of Gentry's psoriasis and psoriatic arthritis, failure to consider the combined effect of all of Gentry's impairments, and failure to follow the treating physician rule regarding Gentry's RFC.

An ALJ is bound to adhere to certain governing standards when assessing the medical evidence in support of a disability claim. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545 (6th Cir. 2004). Chief among these is the rule that the ALJ must consider all evidence in the record when making a determination, including all objective medical evidence, medical signs, and laboratory findings. 20 C.F.R. § 404.1520(a)(3); 20 C.F.R. § 404.1512(b); 20 C.F.R. § 404.1513. The second is known as the "treating physician rule," *See Rogers*, 486 F.3d at 242, requiring the ALJ to give controlling weight to a treating physician's opinion as to the nature and severity of the claimant's condition as long as it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2) (language moved to 20 C.F.R. § 404.1527(c)(2) on March 26, 2012). The premise of the rule is that treating physicians have the best detailed and longitudinal perspective on a claimant's condition and impairments and this perspective "cannot be obtained from objective medical findings alone." 20 C.F.R. § 416.927(d)(2) (language moved to 20 C.F.R. § 416.927(c)(2) on March 26, 2012). Even when not controlling, however, the ALJ must consider certain factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability of the physician's conclusions; the specialization of the physician; and any other relevant factors. *Rogers*, 486 F.3d at 242. In all cases, the treating physician's opinion is entitled to great deference even if not controlling. *Id*. The failure to comply

with the agency's rules warrants a remand unless it is harmless error. *See Wilson*, 378 F.3d at 545-46.

### A.    Objective Medical Evidence Regarding Psoriasis, Psoriatic Arthritis, and other Physical Impairments

The ALJ concluded under step three, without any analysis specific to the severity of Gentry's psoriasis or psoriatic arthritis, that none of Gentry's medical impairments met the severity of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. This conclusion followed the ALJ's finding in step two that Gentry's psoriasis and psoriatic arthritis improved with treatment and that Gentry stopped taking various treatments. By relying on intermittent improvement with treatment, the ALJ focused on the wrong question. Step three asks about the severity of the impairment, *see* 20 C.F.R. § 404.1520(a)(4)(iii), which involves not only periods of improvement but also the trajectory of the illness and the nature of and response to the medications necessary to treat it.

Moreover, although the ALJ stated that she considered all the medical evidence marked as exhibits, her reasoning shows that she discounted the severity of Gentry's conditions—based on periodic improvements and cessation of treatment—by failing to address certain portions of the record, including the evidence of a continuing illness that was not resolved despite use of increasingly serious and dangerous medications. *See Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 435 (6th Cir. 2013) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany-Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports"). In each instance that the record shows an improvement in the psoriasis or psoriatic arthritis, it also reflects a corresponding continued impairment or a subsequent decline. And for each period that Gentry went without prescription treatment for her psoriasis and psoriatic arthritis, there was a corresponding medical reason for stopping treatments. For example, despite taking Methotrexate in 2003, Gentry continued to have severe large psoriatic lesions on her torso, arms, and even her face, and the drug gave

her cold sweats and nausea.  Enbrel, a biologic drug, worked at first on the psoriatic lesions, but Gentry continued to have joint pain and she had a number of negative side effects including dangerous oral infections.  The second time she took Enbrel, in June 2004, the Enbrel didn't work; despite the injections she continued to have "moderate to severe" psoriasis and "even the arthritis ha[d] not improved."  Between 2005 and 2006, the doctor tried Humira. Though Gentry got relief from Humira in the beginning, she continued to have progressively worse joint pain and it proved ineffective in the end. Humira also entailed bad side effects and eventually stopped preventing the psoriasis and psoriatic arthritis that continued to worsen; Gentry ultimately stopped taking it because she was "scared of it."  The psoriasis responded to the Bicillin after several attempts, but it did not go away, and the record shows that even on Bicillin, Gentry was having severe pain in her back, hands, and knees partially associated with the psoriatic arthritis. Gentry testified that she did not want to die from complications with these medications. Her doctors eventually stopped the Bicillin and continued to try other things.

Because of these errors, the ALJ did not properly determine whether Gentry's psoriasis and psoriatic arthritis match any of the listings in Appendix 1 to Subpart P of § 404 under step three of the analysis.  The Appendix lists the following as a disability: "[d]ermatitis (for example, psoriasis, …), with extensive skin lesions that persist for at least 3 months despite continuing treatment as prescribed."  20 C.F.R. § 404, subpt. P, app. 1, § 8.05.  "[E]xtensive skin lesions" are defined as:

> those that involve multiple body sites or critical body areas, and result in a very serious limitation. Examples of extensive skin lesions that result in a very serious limitation include but are not limited to:
>
> a. Skin lesions *that interfere with the motion of your joints* and that very seriously limit your use of more than one extremity; that is, two upper extremities, two lower extremities, or one upper and one lower extremity.
>
> b. Skin lesions *on the palms of both hands* that very seriously limit your ability to do fine and gross motor movements.
>
> c. Skin lesions on the soles of both feet, the perineum, or both inguinal areas that very seriously limit your ability to ambulate.

20 C.F.R. § 404, subpt. P, app. 1, § 8.00(C)(1) (emphasis added).

The ALJ ignored the record evidence supporting a finding that Gentry had extensive skin lesions for at least 3 months despite continuing treatment. In 2003, Gentry had scattered psoriatic plaques "pretty much head to toe, with large lesions of the central portion of the torso and arms" despite the Methotrexate and topical treatments. In 2004, despite taking Enbrel, Gentry's psoriasis continued to be "moderate to severe with ISRs and some slight bruising," and "even the arthritis has not improved." In March 2006, Gentry had significant patches of skin lesions on her trunk and extremities, and by May, Gentry's psoriasis and psoriatic arthritis was "worse since last visit" and she had pain in her hands, back, and knees despite taking Humira since mid-2005. In the summer of 2007, Gentry had worsening psoriasis on her elbows, hands, and knees, along with worsening joint pain in her leg and swelling in her hands despite taking Bicillin. That Gentry was prescribed the higher risk biologic medications indicated that her condition was at least moderate to severe. *See* NPF, Psoriasis, Treatments, Moderate to Severe Psoriasis: Biologic Drugs.

## B.     Combined Effect of Impairments on Residual Functional Capacity

The ALJ's conclusions under step four are similarly lacking in support. The ALJ found that although Gentry's conditions could cause the functional limitations alleged, the allegations were not credible. Specifically, although the ALJ found that psoriasis could cause bleeding, swelling, and additional limitations in prolonged sitting, she discredited Gentry's claims because Gentry went without psoriasis treatments at various points in time and because no treating source records document an ongoing problem with bleeding. The ALJ discredited Gentry's allegations of pain on the basis that "no treating source records document" restrictions in the ability to sit, stand, or use her hands; because Gentry has a "propensity to exaggerate her subjective complaints;" and because Gentry was able to provide "twenty-four hour care" for her toddler son.

The ALJ ignored substantial record evidence that supports Gentry's complaints about the bleeding and other effects of her psoriatic lesions. The ALJ inappropriately discredited Gentry without determining whether her claims of bleeding, swelling, and pain were consistent with the medical record. They were. The record evidence from the

NPF indicates that "[a]ny significant movement or pressure in severe cases may cause affected skin to split open, painfully, and bleed."  The record reflected severe problems with the lesions over time and the ALJ herself observed at the hearing that Gentry had a visible outbreak of psoriatic lesions.  As for the frequency of Gentry's treatments, or lack of frequency by the time of the 2011 hearing, the medical evidence indicated that Gentry had been taking progressively more serious and more risky psoriasis treatments for almost two decades, that the treatments were either poorly tolerated or stopped working, and that few safe treatment alternatives remained.

The ALJ also ignored significant evidence that supports Gentry's complaints of pain and her allegations of restrictions on sitting, standing, and using her hands.  In mid-2005, for example, Dr. Alissandratos, the rheumatologist, recorded swelling and pain in Gentry's hands and back, and said the same thing in 2006.  In 2007, the swelling and joint pain in the hands continued.  In 2008, the psoriatic lesions were on Gentry's hands and nails.  Dr. Galyon, the agency's own consulting physician, said in 2006 that Gentry had "obvious psoriasis and psoriatic arthritis which weakens both hands and causes pain in both hands, knees, and back," and that the medication did "not seem to be offering her a good bit of relief."  The evidence of Gentry's back impairments goes back to the 1994 car accident, but became progressively more abundant in the record as Gentry was diagnosed with discogenic radiculitis, chronic cervical facetogenic pain, psoriatic arthritis, inflammatory spondyloarthropathy, cervical spondylosis, sciatica, lumbosacral/thoracic radiculopathy, degenerative joint disease at L5-S1, severe right neural foramina narrowing at C5-6, and a broad-based disc osteophyte bulge at C3-4.  As recognized by the ALJ, many of these diagnoses were supported by Xrays and CT scans, the others were supported by examinations, and these conditions could cause the chronic neck, back, shoulder, ankle, foot, and hip pain alleged.  Dr. Dowling specifically noted in 2005 that Gentry had a burning, sharp pain that grew worse with sitting.  Gentry visited a pain clinic for at least three years.

By ignoring the record evidence supporting Gentry's complaints of pain, including the ones over a number of years made to her doctors from whom she received

treatments with varying degrees of success, the ALJ violated the agency's duty to "consider all [the claimant's] symptoms, including pain, and the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence."  20 C.F.R. 404.1529(a).  Moreover, she also violated the agency's rule that it is not to "reject [the claimant's] statements about the intensity and persistence of …pain or other symptoms or about the effect [these] symptoms have on [the] ability to work solely because the available objective medical evidence does not substantiate [the claimant's] statements."  20 C.F.R. 404.1529(c)(2).

Additionally, by reviewing Gentry's various diagnoses and treating physicians one at a time, the ALJ violated the agency's promise to "consider the combined effect of all of [the claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity."  20 C.F.R. § 404.1523.  When viewed holistically, the record reflects that Gentry has ongoing and progressive physical impairments dating back to 1994, taking a turn for the worse in 2003, and growing increasingly complicated by 2009.  The objective medical evidence does not support the ALJ's conclusions that most of Gentry's impairments had been sufficiently resolved, but instead reveals a patient who sought treatment from doctors who treated her for a number of injuries and illnesses that resulted in overlapping sources of pain.  When discussing each doctor individually, the ALJ drew adverse conclusions because Gentry went months, and sometimes years, before returning to the same doctor.  But the record reveals that Gentry sought treatment from other specialists during these absences, usually for identical or related complaints of pain and psoriasis.  By 2005, Gentry's doctors themselves recognized the overlapping impairment caused by multiple conditions.  For example, Dr. Dowling's assessment of Gentry's spinal and cervical conditions included an assessment of "underlying psoriatic arthritis."

The ALJ determined that Gentry "exaggerates" her subjective complaints because she stated that she required a knee, hip, and ankle replacement when in fact her 1994 surgeries were an "open reduction internal fixation of the left talar neck, open reduction internal fixation of the medial malleolus, arthrotomy of the right hip with

excision of the osteochrondral loose fragment and repair of the joint capsule, and irrigation and debridgement of the right knee laceration." A patient's misunderstanding or colloquial description of her multiple and complicated surgeries is hardly an example of a "subjective complaint." Moreover, it is questionable whether a statement that she required joint replacements would be an exaggeration for a patient who was told by a treating physician that "it would not be completely unreasonable for her to consider a below the knee amputation."

The only record evidence suggesting that Gentry exaggerates her complaints of pain is a 2004 statement by Gentry's mother to Dr. Jameson suggesting that there was a psychological component to Gentry's pain in her ankle because she had previously done well. Dr. Jameson himself said that he did not know why Gentry's mother said that, and, in the same record, he discussed the results of Gentry's Xrays showing severe arthrosis of the ankle joint, probable avascular necrosis of the talus, and advanced arthritic changes in the subtalar joint. A single hearsay statement does not negate the treating physician's determination or the objective medical evidence.

The ALJ's findings discrediting Gentry because she provides care for her toddler son does not find substantial support in the record. The 2011 report by Dr. Wisdom indicates that Gentry "watches" her son; does light house work but does not wash dishes, fold clothes, mop, or iron because of the bleeding on her hands; stands for up to 20 minutes; sits for up to half an hour; and has a weak grasp due to hand pain and sensitive lesions. The record supports Gentry's limited functions in the home, as does the fact that Gentry has available assistance from her husband and two adult step-children.

### C.     The Treating Physician Rule and Gentry's Residual Functional Capacity

The treating physician rule also applies to the RFC of the claimant. *See*, *e.g.*, *Cole*, 661 F.3d at 937-38. A doctor's conclusion that a patient is disabled from all work may be considered as well, but could "never be entitled to controlling weight or given special significance" because it may invade the ultimate disability issue reserved to the

Commissioner.  SSR 96–5p, 1996 WL 374183, at *5 (1996) ("Medical sources often offer opinions about whether an individual . . . is 'disabled' or 'unable to work [.]' . . . Because these are administrative findings that may determine whether an individual is disabled, they are reserved to the Commissioner."); 20 C.F.R. § 404.1527(e)(1) (provision moved to 20 C.F.R. § 404.1527(d)(1) on March 26, 2012).

As to the RFC or medical condition, an ALJ may only choose not to give a treating physician's opinion controlling weight if she gives "good reasons . . . for the weight give[n]," 20 C.F.R. § 404.1527(d)(2) (now in 20 C.F.R. § 404.1527(c)(2)), and if those reasons are "supported by the evidence in the case record, and [are] sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight," SSR 96-2p, 1996 WL 374188, at *5 (1996).  If the ALJ decides not to give a treating physician's opinion controlling weight, the ALJ may not reject the opinion, but must apply other factors to determine what weight to give the opinion, such as "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source[.]"  *Wilson*, 378 F.3d at 544 (citing § 404.1527(d)(2), now in § 404.1527(c)(2)).

The ALJ found that prior to the last insured date of December 31, 2009, Gentry retained the RFC to "lift 10 pounds, stand and/or walk 2 hours in an eight hour workday, sit without restriction and occasionally balance and stoop, but never climb, kneel, crouch and crawl."  This RFC is nearly identical to the one determined by Dr. Galyon in his 2006 consulting report except for the restrictions Dr. Galyon placed on pulling and his opinion that the limitations were likely progressive.  In setting that RFC, however, the ALJ discredited the 2009 opinion of Dr. Murphy, one of Gentry's treating physicians, finding that Gentry could not stand, sit, or walk for prolonged periods of time.  The ALJ noted only that Dr. Murphy had not seen Gentry in almost nine months when he provided an opinion and that his conclusion that the leg brace "compromises her back" is not substantiated by objective medical findings.  The ALJ also inexplicably concluded

that Dr. Murphy's opinion is "not inconsistent" with the ALJ's RFC even though Dr. Murphy opined that Gentry cannot sit for long periods of time and the ALJ's RFC contained no restrictions on sitting.

More importantly, the ALJ's analysis violates the treating source rule because the reasons for discrediting Dr. Murphy's opinion are not supported by the record. Dr. Murphy's opinion that Gentry's leg brace caused increased pain in her back is directly supported by another treating physician, Dr. Friedman. Dr. Friedman treated Gentry for, among other things, back pain caused by degenerative joint disease at L5-S1, a disc bulge at L4-5, a severe right neural foramina narrowing at C5-6, and a broad-based disc osteophyte bulge at C3-4. He said that the brace prescribed by Dr. Murphy "produced increased lower back pain," worsening the symptoms from the spine conditions.

Dr. Murphy's opinion as to Gentry's limitations in sitting is also supported by the functional status assessment done when Gentry attended physical therapy in 2008 for her back pain. The physical therapist's initial assessment said that Gentry had 50% loss of extension in her lumbar motion and pain that prevented walking more than a quarter of a mile, standing more than 10 minutes, sitting more than 10 minutes, or sleep without medication. The functional goals of physical therapy included increasing Gentry's tolerance for sitting and standing to 20 minutes with fewer symptoms. Even if she had met these goals, Dr. Murphy's assessment that Gentry cannot sit for a prolonged period of time would be accurate. The physical therapy notes, however, do not indicate a significant improvement in pain before completion of the program.

Dr. Murphy's opinion is, in fact, also supported by the RFCs provided by the Social Security Agency's own consulting physicians. Dr. Galyon's 2006 RFC found that Gentry's restrictions on standing and walking did not then extend to restrictions on sitting, but he said that Gentry's limitations were "permanent and more than likely progressive." According to the 2011 consulting exam by Dr. Wisdom, Gentry's limitations had indeed progressed. By then, Gentry could only stand for up to 15 or 20 minutes, could sit for up to half an hour, and had a weak grasp due to psoriasis-related sensitivity. While Dr. Wisdom's exam occurred after Gentry's last insured date, it

provides support to the opinions from prior exams. It is not surprising, or unsupported in the record, that Gentry would be unable to sit for prolonged periods of time by January 2009. These reports, in combination, reveal a progressive and intertwined set of problems from which Gentry had severe limitations in 2006, increased limitations in 2009, and even more limitations in 2011.

Nor does the comment by the ALJ that Dr. Murphy had not seen Gentry for a number of months when he provided the 2009 statement, undercut his opinion. Dr. Murphy had treated Gentry for a period of a year and a half; he began seeing her on referral from Dr. Schnapp, a pain specialist who had been treating Gentry for back pain and leg pain, among other things; and he had reviewed her extensive records spanning years from Dr. Schnapp and Dr. Jameson, the orthopedic surgeon who shared Dr. Murphy's specialty. As discussed above, the ALJ's findings that Gentry is does not have the described functional limitations because she has a son also is unsupported by the record. Moreover, even if the ALJ's brief statements constituted an appropriate reason not to give his opinion controlling weight, the ALJ erred by not completing the process. *See Rogers*, 486 F.3d at 242. The ALJ failed to apply the other factors—such as the nature of the treating relationship and the supportability and consistency of the opinion—to determine the appropriate weight to give to Dr. Murphy's opinion. *See Wilson*, 378 F.3d at 544. This violated the treating physician rule.

### D.    Substantial Evidence on the Record as a Whole

The "ALJ's failure to follow agency rules and regulations denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole*, 661 F.3d at 939-40. These legal errors, especially the ones involving ignoring the medical evidence from Gentry's treating physicians, were not harmless because they effectively resulted in the ALJ's disregard of a substantial body of medical evidence supporting a finding that Gentry is disabled. *See id.*; s*ee also Kalmbach v. Comm'r v. Soc. Sec.*, 409 F. App'x. 852, 862 (6th Cir. 2011) (finding ALJ legal errors in applying treating physician rule did not amount to harmless error). We conclude that the ALJ's violation of the treating physician rule and her other errors undermine her

decision. *See Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir.2009) (noting "[w]e do not hesitate to remand" when an ALJ violates the treating physician rule). The district court opinion echoed these errors and failed to grapple with the ALJ's failure to follow the agency rules.

These errors, when viewed in the light of substantial evidence on the record as a whole, persuade us to reverse and remand to the Commissioner for a finding of disability prior to Gentry's last date insured, and an award of benefits. As we have already explained above, the record contains significant evidence showing that Gentry had extensive skin lesions, interfering with the motion of her joints and limiting the use of her extremities, for at least three months despite continuing treatment. This is enough for a finding under step three that Gentry has a disability under Appendix 1. *See* 20 C.F.R. § 404, subpt. P, app. 1, §§ 8.00(C)(1), 8.05. And even if that were not sufficient, the record plainly supports a finding that Gentry's RFC precludes even sedentary work because of limitations to sitting and the use of her hands. During the administrative hearing, both the ALJ and the VE opined that Dr. Wisdom's 2011 report showed that Gentry was "disabled." The dispositive distinction between his report and the 2006 report on which the ALJ relied was the difference in limitations on sitting. As Dr. Murphy's 2009 report showed that Gentry had limitations on sitting, it was sufficient to show that Gentry was disabled prior to her last insured date of December 31, 2009.

## IV.     CONCLUSION

We have authority to affirm, modify, or reverse the ALJ's decision with or without remanding for rehearing. 42 U.S.C. § 405(g); *Melkonyan v. Sullivan*, 501 U.S. 89, 100-02 (1991). Benefits may be awarded immediately if all necessary factual issues have been resolved, "the proof of disability is strong, and opposing evidence is lacking in substance, so that remand would merely involve the presentation of cumulative evidence, or where the proof of disability is overwhelming." *Kalmbach*, 409 F. App'x at 865 (internal quotation marks omitted). Such is the case here, where there have been two remands and three hearings. The Commissioner's decision is not supported by substantial evidence and new evidence would not be relevant at this point in the

proceedings.  In light of the extensive opinions of treating physicians as to the severity of Gentry's psoriasis and psoriatic arthritis, and in light of the evidence of Gentry's impairments, we conclude that substantial evidence on the record as a whole supports a finding of total disability.

Accordingly, we **REVERSE** the judgment and **REMAND** with instructions to the district court to remand the case to the Commissioner for the limited purpose of granting an award of benefits as of the disability onset date.