RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 22a0166p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

TODD ALLEN MOATS,

            *Plaintiff-Appellant*,

    *v.*

COMMISSIONER OF SOCIAL SECURITY,

            *Defendant-Appellee*.

No. 21-3702

───────────────

Appeal from the United States District Court for the Northern District of Ohio at Toledo.
No. 3:20-cv-00265—Jeffrey James Helmick, District Judge.

Decided and Filed: July 27, 2022

Before: SUTTON, Chief Judge; KETHLEDGE and READLER, Circuit Judges.

───────────────

## COUNSEL

**ON BRIEF:** Randal S. Forbes, FORBES RODMAN PC, Angola, Indiana, for Appellant. Alison Schwartz, SOCIAL SECURITY ADMINISTRATION, Chicago, Illinois, for Appellee.

READLER, J., delivered the opinion of the court in which SUTTON, C.J. and KETHLEDGE, J., joined. READLER, J. (pp. 10–14), also delivered a separate concurring opinion.

───────────────

## OPINION

───────────────

CHAD A. READLER, Circuit Judge. Todd Moats suffers from peripheral neuropathy, which prevents him from wearing closed-toed shoes for lengthy periods. This condition caused Moats to leave his job as a forklift operator and apply for disability insurance benefits and supplemental security income through the Social Security Administration. Following a hearing,

an administrative law judge found that Moats's condition prevented him from returning to his previous job. Nonetheless, because, as the ALJ found, Moats could still perform a number of jobs available throughout the national economy, his application for benefits was denied. As substantial evidence supports that determination, we affirm. In so doing, we reject Moats's argument that the ALJ failed to adequately develop the record.

## BACKGROUND

Todd Moats worked as a forklift operator at the Campbell Soup Company. He eventually left that position due to pain and excessive sweating in his feet when he wore closed-toed shoes. A few months later, he applied for disability insurance benefits and supplemental security income through the Social Security Administration. In his application, Moats alleged that he was disabled due to his neuropathy as well as a host of other conditions, including diabetes, fatigue, and a learning disability. The agency denied Moats's application and subsequent request for reconsideration.

Moats requested a hearing before an ALJ. The agency notified Moats by letter that he was allowed representation at the hearing and provided a list of legal aid organizations. In its letter, the agency also detailed the process for submitting evidence, indicating that Moats could testify and put on witnesses at the hearing. Finally, the agency explained what factors the ALJ would consider when determining Moats's eligibility for disability benefits.

Disability benefits hearings before the Social Security Administration, it bears noting, are considered adjudicative, not adversarial, in nature. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1152 (2019)). A claimant has the right to designate a person to represent him during the hearing. 42 U.S.C. § 406; 20 C.F.R. § 404.938(b)(2). The Social Security Administration, on the other hand, has no representative before the ALJ. *Carr v. Saul*, 141 S. Ct. 1352, 1359 (2021). Together, the ALJ and the claimant—here Moats—consider the claimant's request for benefits through an "informal" process "examining (among other things) the kind and number of jobs available for someone with the applicant's disability and other characteristics." *Biestek*, 139 S. Ct. at 1151–52.

On the day of Moats's hearing, he arrived without legal counsel. The ALJ emphasized to Moats the benefits of representation and offered to postpone the hearing if Moats desired more time to secure a representative. But Moats declined, indicating that he did not "[n]eed a lawyer" and was "doing this [him]self."

So the hearing progressed to the evidentiary phase. The ALJ began by reviewing the case file with Moats. Moats indicated that he had received additional treatment since the file was last updated and provided copies of the relevant treating physician records. The ALJ explained the process for evaluating disability claims; Moats had no questions. Moats then described his living situation (house), age (38), marital situation (married with no children), educational attainment (high school graduate), driving ability (licensed and drives roughly once each week), and ability to perform household tasks (capable of completing typical household chores). Next, Moats explained that, although he has some trouble spelling "big words," he can read the newspaper and do basic math. He also discussed his employment history. In response to a question from a vocational expert, Moats indicated that he "probably could" perform a job that allowed him to remain seated without shoes all day.

Following Moats's testimony, the ALJ heard from two witnesses. One was Moats's wife. She confirmed that Moats could not wear closed-toed shoes for long periods and provided additional details about medical treatment he had received. The other was a vocational expert. His testimony's overriding purpose was to contrast Moats's previous jobs with other positions available in the national economy. The ALJ asked the expert if someone with Moats's background could find gainful employment in a position that did not require closed-toed shoes and involved only sedentary work with occasional movement up ramps or stairs. The expert testified that roughly 32,000 jobs of that ilk were available in the national economy. Examples included positions as a general office clerk, an addresser, and a surveillance monitor.

From this record, the ALJ determined that although Moats suffered from impairments that prevented him from returning to his forklift position, his residual functional capacity was sufficient to perform many other jobs in the national economy. Accordingly, the ALJ concluded that Moats does not suffer from a "disability," as that term is used in the Social Security Act, and denied his request for benefits. Moats sought review of the ALJ's decision in the district court.

That court sided with the Social Security Administration, concluding that substantial evidence supported the ALJ's determination.  This appeal followed.

## ANALYSIS

We review a district court's decision regarding benefits eligibility de novo.  *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014).  This means that we, like the district court, will uphold the ALJ's decision unless the ALJ failed to apply the correct legal standard or made findings that are unsupported by "substantial evidence."  42 U.S.C. § 405(g); *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006).  "'[S]ubstantial evidence' is a 'term of art'" in this setting.  *Biestek*, 139 S. Ct. at 1154 (citation omitted).  And it is "not [a] high" threshold.  *Id.*  While it requires "more than a mere scintilla" of evidence, substantial evidence "means only . . . 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Id.* (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

Eligibility for benefits payments under Section 223 of the Social Security Act depends on the existence of a "disability."  42 U.S.C. § 423(a)(1)(E).  A disability, in turn, is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  *Id.* § 423(d)(1)(A). Not every impairment, in other words, will satisfy this definition.  Rather, the impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  *Id.* § 423(d)(2)(A).  Gainful work "exists in the national economy" if it "exists in significant numbers."  *Id.*

1.  Moats challenges the ALJ's finding that, despite Moats's impairments, he could perform a significant number of jobs in the national economy.  Critical to the ALJ's conclusion was the vocational expert's testimony indicating that Moats could work in a number of positions (for example, as a general office clerk, addresser, or surveillance monitor) that together comprise approximately 32,000 jobs nationwide.

How should a factfinder go about valuing a vocational expert's testimony? We can derive the answer in part from the Supreme Court's *Biestek* decision. Vocational experts, *Biestek* explained, are "professionals under contract with [the Social Security Administration] to provide impartial testimony in agency proceedings." 139 S. Ct. at 1152. The experts provide "current knowledge" about the nature and availability of various jobs based on publicly available data as well as the experts' own experience in job placement or career counseling. *Id.* at 1152–53 (citation omitted). ALJs will often rely on vocational experts to determine what kind of work (if any) a claimant could perform. *See id.*; 20 C.F.R. §§ 404.1566(e), 416.966(e). And, as *Biestek* suggests, when a qualified vocational expert testifies that a person with the claimant's work experience and physical limitations could perform a significant number of jobs available in the national economy, the ALJ has a solid basis for denying disability benefits. *See Biestek*, 139 S. Ct. at 1155–57 (holding that a vocational expert's testimony identifying a significant number of sedentary jobs the claimant could perform was substantial evidence supporting the denial of benefits); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 549 (6th Cir. 2004); *Smith v. Halter*, 307 F.3d 377, 378 (6th Cir. 2001). Especially so, we note, when the vocational expert is well-credentialed and "has a history of giving sound testimony about job availability in similar cases." *Biestek*, 139 S. Ct. at 1155.

With this backdrop in mind, we agree that the vocational expert's testimony at Moats's hearing amounted to substantial evidence supporting the ALJ's decision. For one thing, the expert is well-credentialed. He is certified by the American Board of Vocational Experts, has worked for Ohio's Bureau of Vocational Rehabilitation for 30 years, and has testified as a vocational expert in at least 22 similar hearings since 2007—credentials even stronger than those of the expert in *Biestek*. *See id.* at 1153 (noting that the *Biestek* expert had been an employment counselor for ten years and served as a vocational expert in disability hearings for five years). For another thing, his assessment that Moats could perform a number of available jobs was consistent with data from the Dictionary of Occupational Titles, published by the Department of Labor. *See* 20 C.F.R. §§ 404.1566(d)(1); 416.966(d)(1) (explaining that the ALJ will consider the Dictionary of Occupational Titles when determining whether jobs appropriate for the claimant exist in the national economy in significant numbers); *O'Neal v. Comm'r of Soc. Sec.*, 799 F. App'x 313, 317 (6th Cir. 2020) (order) ("[Dictionary of Occupational Titles] data can

establish the existence of jobs in the national economy in significant numbers."). These twin considerations bolster the value of the expert's testimony as well as the ALJ's decision to rely on that testimony in denying Moats's claim.

Moats disagrees. As he sees things, the vocational expert's testimony lacks reliability for two reasons. First, the expert did not produce (nor did the ALJ request) the survey data supporting the expert's testimony about national job numbers. *Biestek*, however, explains that testimony from a well-credentialed expert "will clear (even handily so) the more-than-a-mere-scintilla threshold" even in the absence of underlying survey data. 139 S. Ct. at 1157. Second, Moats contends that neither the expert nor the ALJ specified the threshold number of suitable jobs required to constitute a "significant" number of jobs for purposes of benefits considerations. But this argument too falls flat. Congress did not define "significant" in the Social Security Act. Nor has the Commissioner defined the term by rule. In the absence of a statutory or regulatory command, we have said that the ALJ must make the determination on a case by case basis. *Hall v. Bowen*, 837 F.2d 272, 275 (6th Cir. 1988). And the ALJ's finding here that 32,000 suitable jobs exist across the nation "fits comfortably within what this court and others have deemed 'significant.'" *Taskila v. Comm'r of Soc. Sec.*, 819 F.3d 902, 905 (6th Cir. 2016) (6,000 jobs); *see also Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 579 (6th Cir. 2009) (2,000 jobs); *Jenkins v. Bowen*, 861 F.2d 1083, 1087 (8th Cir. 1988) (500 jobs); *Barker v. Sec'y of Health & Hum. Servs.*, 882 F.2d 1474, 1479 (9th Cir. 1989) (1,266 jobs).

In sum, the expert's uncontradicted testimony easily qualifies as "the kind of evidence—far more than a mere scintilla—that a reasonable mind might accept as adequate to support a finding about job availability." *Biestek*, 139 S. Ct. at 1155 (quotation marks omitted).

2. Moats presses a second, related argument. Despite *Biestek*'s clear statement that a vocational expert need not disclose the survey data underlying his testimony, Moats believes that the ALJ should have taken it upon himself to question the expert about that information. Why? Because Moats was not represented by counsel at his hearing, leaving the ALJ, in Moats's mind, with a heightened duty to develop the record.

Promoting the claimant's case, of course, is not the ALJ's obligation. The ALJ, remember, is a neutral factfinder, not an advocate. *See Sims v. Apfel*, 530 U.S. 103, 110–11 (2000) (plurality opinion) ("Social Security proceedings are inquisitorial rather than adversarial."); *Richardson v. Perales*, 402 U.S. 389, 410 (1971) ("The [ALJ], furthermore, does not act as counsel. He acts as an examiner charged with developing the facts."). So while the ALJ must ensure that every claimant receives "a full and fair hearing," *Duncan v. Sec'y of Health & Hum. Servs.*, 801 F.2d 847, 856 (6th Cir. 1986), the ultimate burden of proving entitlement to benefits lies with the claimant, 20 C.F.R. § 404.1512(a).

Invoking a handful of our earlier cases, Moats contends that his was a special case deserving of heightened attention from the ALJ. He derives that rule from our decision in *Lashley v. Secretary of Health & Human Services*, 708 F.2d 1048, 1051 (6th Cir. 1983), which suggested that an ALJ has a "special duty" to develop the record "where the claimant appears without counsel." By way of published decisions, however, we have done little to build upon whatever foundation *Lashley* laid some 40 years ago. Indeed, Moats fails to cite any other published case from our Court that has imposed *Lashley*'s "special duty" on Social Security ALJs.

Time and practice together confirm that *Lashley* is best viewed as an extreme example of an ALJ failing to adequately develop the record before it. *See Born v. Sec'y of Health & Hum. Servs.*, 923 F.2d 1168, 1172 (6th Cir. 1990) (explaining that, given *Lashley*'s extreme circumstances, that case merely held "that the ALJ's duty to develop a full and fair record with a pro se claimant had not been met"). The claimant there appeared without counsel. He had only a fifth-grade education. And he "was inarticulate, and appeared to be easily confused." *Lashley*, 708 F.2d at 1050–52. For instance, he explained to the ALJ that, after suffering a series of strokes, he had difficulty gathering his thoughts; he would "know what [he was] trying to say" but would be unable to say it. *Id.* at 1050. The strokes also impaired his memory and his ability to read. *Id.* Despite these obvious limitations, the ALJ questioned Lashley only "[s]uperficial[ly]" and concluded the hearing after a mere 25 minutes. *Id.* at 1052. That combination of extreme impairments coupled with the ALJ's perfunctory review seemingly left an insufficient record to accurately gauge the extent of the claimant's disability. *Id.* But absent

such acute circumstances, we do not "heighten" the ALJ's fact-finding responsibility, even where a claimant is unsophisticated and appears without counsel. *See, e.g.*, *Born*, 923 F.2d at 1170–72 (finding that, in a case involving a claimant with only an eighth-grade education, the ALJ satisfied the duty to develop the record even without extensive questioning because there were no discrepancies in the record and the claimant "gave no evidence of impaired mental ability").

Thankfully, Moats's case is not one of extreme circumstances. There is no indication that Moats failed to understand the hearing's procedures. To the contrary, when the hearing began, he indicated that he had no questions about the process for evaluating his disability, and he opted to proceed without representation because he could "do[] this [him]self." His preparation for the hearing—reviewing and supplementing his case file—indicates that he understood his evidentiary burden as well. *See Wilson*, 280 F. App'x at 457–59 (explaining that the ALJ adequately developed the record where, as here, the claimant was able to recount her employment history, explain her disabling medical condition, and produce corroborating medical records).

In addition, Moats was able to answer questions from the ALJ and vocational expert regarding his medical, educational, and employment history. Moats explained how his neuropathy forced him to leave his previous job and why he believed his condition would preclude him from any job requiring him to wear closed-toed shoes. And his wife corroborated that testimony with additional information about his impairment and treatment history. *See Nabours*, 50 F. App'x at 275–76 (holding that the ALJ fully and fairly developed the record where the claimant was "sufficiently articulate in her direct testimony"). In total, Moats's hearing lasted over an hour, more than twice as long as the hearing in *Lashley*.

On this record, we see no indication that Moats was prevented "from fully developing the claims and relevant evidence." *Id.* at 276. Indeed, the exact opposite is true. The ALJ made every effort to assist Moats, including by inviting him to question the vocational expert and offering to help him phrase his questions properly. *See Thomas v. Comm'r of Soc. Sec.*, 550 F. App'x 289, 291 (6th Cir. 2014) (per curiam) (finding no reversible error where the unrepresented claimant had been notified of her right to question the expert and the ALJ invited her to do so

following the expert's testimony). The ALJ thus satisfied his duty to investigate and develop the relevant facts.

* * *

We affirm the judgment of the district court.

---

**OPINION**

---

CHAD A. READLER, Circuit Judge, concurring. Nearly four decades ago, before any current member of the Court had joined our ranks, we decided *Lashley v. Secretary of Health & Human Services*, 708 F.2d 1048 (6th Cir. 1983). Over time, *Lashley* has become something of a legal relic, in no small part due to its loose reasoning. *Lashley* hinted at a nebulous "special duty" imposed upon Social Security ALJs in unique instances. But it did not explain in any detail the rule it purportedly adopted.

In light of that uncertainty, it was left to future panels to offer their best guesses as to *Lashley*'s import. And those panels seemingly did so with trepidation, as none of them opted to publish their conclusions. Some of those unpublished cases describe *Lashley* as establishing a "heightened duty to develop the record" when three "special circumstances" are present: (1) the claimant is without counsel, (2) he is unfamiliar with hearing procedures, and (3) he is unable to present his case effectively. *Wilson v. Comm'r of Soc. Sec.*, 280 F. App'x 456, 459 (6th Cir. 2008); *see also Lambdin v. Comm'r of Soc. Sec.*, 62 F. App'x 623, 625 (6th Cir. 2003) (order); *Trandafir v. Comm'r of Soc. Sec.*, 58 F. App'x 113, 115 (6th Cir. 2003); *Nabours v. Comm'r of Soc. Sec.*, 50 F. App'x 272, 275 (6th Cir. 2002) (order); *Norman v. Comm'r of Soc. Sec.*, 37 F. App'x 765, 765 (6th Cir. 2002); *Rise v. Apfel*, 234 F.3d 1269, at *2 (6th Cir. 2000) (Unpublished Table Decision); *Weissmiller v. Sec'y of Health & Hum. Servs.*, 785 F.2d 311, at *2 (6th Cir. 1986) (per curiam) (Unpublished Table Decision). Yet in all but one instance, *see Lambdin*, 62 F. App'x at 625, we ultimately found the ALJ's factual development adequate.

That trepidation was warranted. Upon reflection, *Lashley*'s suggestion of a "special duty" has no shortage of imperfections. Start with a basic principle of administrative law. Absent constitutional concerns, Article III courts may not impose procedural requirements on agencies beyond those mandated by statute. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101–02 (2015); *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 543–49 (1978). That understanding alone deeply undermines *Lashley*, which failed to identify a basis in

the Social Security Act for imposing a "heightened duty" on ALJs in particular circumstances. *See BedRoc Ltd. v. United States*, 541 U.S. 176, 183 (2004) ("[O]ur inquiry begins with the statutory text, and ends there as well if the text is unambiguous."). Nor is a textual basis readily apparent. The Social Security Act merely instructs the Commissioner to "adopt reasonable and proper rules . . . for the nature and extent of the proofs and evidence and the method of taking and furnishing the same in order to establish the right to benefits." 42 U.S.C. § 405(a). It makes no mention of a "heightened duty." And the Commissioner, to my knowledge, has not adopted such a rule.

So where, one might ask, did *Lashley* discover this supposed duty? In the Act's general "remedial purpose." *Lashley*, 708 F.2d at 1051. But that is perhaps the slimmest of reeds upon which to rest such a broad duty. "After all," the Supreme Court has more recently noted, "almost every statute might be described as remedial in the sense that all statutes are designed to remedy some problem." *CTS Corp. v. Waldburger*, 573 U.S. 1, 12 (2014).

More to the point, we may not elevate a statute's ostensible purpose over its text. *See Oklahoma v. Castro-Huerta*, 142 S. Ct. 2486, 2496 (2022) ("As this Court has repeatedly stated, the text of a law controls over purported legislative intentions unmoored from any statutory text."); *In re Sanders*, 551 F.3d 397, 402 (6th Cir. 2008) ("The most conspicuous place to look for the purpose of a law of course is the text of the statute that both houses of Congress passed and that the President signed into law."). Perhaps *Lashley*'s "purposivist" manner of interpretation had some pedigree when the case was decided. *See, e.g.*, *United Steelworkers of Am. v. Weber*, 443 U.S. 193, 201–203 (1979) (rejecting a "literal interpretation" of Title VII in favor of "legislative history," "historical context," and "Congress' primary concern in enacting" the statute). But it has little to recommend it today, both for practical and substantive reasons. *See Sexton v. Panel Processing, Inc.*, 754 F.3d 332, 339 (6th Cir. 2014) ("Abstract appeals to purpose and legislative history at any rate have little value in interpreting a precise and reticulated statute . . . ." (quotation marks omitted)). Functionally, a statute's "purpose" is not always easily discerned. *Cf. Patel v. U.S. Citizenship & Immigr. Servs.*, 732 F.3d 633, 636 (6th Cir. 2013) ("[I]t is folly to talk about 'the purpose' of the statute when the statute reflects a compromise between multiple purposes."). And even if we are confident of Congress's

intentions in enacting a law, as a substantive matter, "it is quite mistaken to assume . . . that whatever might appear to further the statute's primary objective must be the law." *Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1725 (2017) (cleaned up). For this reason, it is well understood today that we "cannot replace the actual [statutory] text with speculation as to Congress' intent." *Magwood v. Patterson*, 561 U.S. 320, 334 (2010). *Lashley*'s "heightened duty" language, in other words, is a textbook example of an interpretive practice that has long fallen out of favor. *See Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2364 (2019) (deeming the purposivist approach "a relic from a bygone era of statutory construction" (quotation marks omitted)).

To buttress its atextual approach, *Lashley* invoked the Supreme Court's decision in *Richardson v. Perales*, 402 U.S. 389 (1971). Why it did so, however, is far from clear. *Perales* merely emphasized the simple (and seemingly neutral) point that a Social Security ALJ serves "as an examiner charged with developing the facts," rejecting the notion that the ALJ is biased in favor of the Social Security Administration. *Id.* at 410. Remarkably, *Lashley* seemed to jerry-rig *Perales*'s recognition of an ALJ's even-handed responsibility for developing the facts into a springboard to conclude that the ALJ must "assume a more active role in the proceedings" to assist unrepresented claimants. *Lashley*, 708 F.2d at 1051 (cleaned up). How *Perales* can fairly be read in that manner escapes the eye. For far from acknowledging an ALJ's heightened duty to assist the claimant, *Perales* at bottom rejected the idea that an ALJ should favor one side or the other. 402 U.S. at 408–10.

Making matters worse, the *Lashley* "heightened duty" standard is no more workable than it is grounded in law. In nearly all respects, the "heightened duty" rule suffers from problems of administrability and unpredictability. Case in point, far from offering direction on how to apply its own standard, *Lashley* instead confessed the haziness of its approach, conceding that "[t]here is no bright line test for determining when the [ALJ] has . . . failed to fully develop the record." 708 F.2d at 1052; *cf. Tomei v. Parkwest Med. Ctr.*, 24 F.4th 508, 513 (6th Cir. 2022) ("[A] bright-line rule . . . brings clarity and consistency"); Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. Chi. L. Rev. 1175 (1989) (discussing the advantages of bright line rules).

Left to fill in the gap, our Court's subsequent unpublished decisions have identified three factors as bearing on the inquiry. *See, e.g.*, *Wilson*, 280 F. App'x at 459. None of these factors, however, suffers from an abundance of precision. The first is the absence of counsel. Although we have sometimes taken extra care to scrutinize the denial of benefits in cases involving unrepresented claimants, we have also made it clear that a claimant may waive his statutory right to counsel. *See Nabours*, 50 F. App'x at 275; *Lashley*, 708 F.2d at 1052. In other words, "the mere fact that a claimant was unrepresented is not grounds for reversal." *Duncan v. Sec'y of Health & Hum. Servs.*, 801 F.2d 847, 856 (6th Cir. 1986). It follows that in cases where the ALJ has advised the claimant that he may designate a representative and the claimant subsequently chooses to proceed without one, the ALJ has satisfied his statutory responsibility. *See* 42 U.S.C. § 406(c) (directing ALJs to "notify each claimant . . . of the options for obtaining attorneys"). Any other approach has the dubious effect of incentivizing a claimant to forego counsel at his hearing and, in the event of an unfavorable decision, appeal on the basis that the lack of counsel denied him a fair hearing.

The two remaining factors are equally muddled. How "unfamiliar with hearing procedures" must a claimant be, and, relatedly, how "ineffective" must the claimant be in presenting his case, before an ALJ's heightened duty is triggered? *Lashley* does not say. Nor, by and large, do our follow-on unpublished cases. Yet as *Lashley* candidly refuses to offer ALJs a roadmap for how best to conduct their hearings, it at the same time commits the Court to "scrutiniz[ing] the record with care," leaving the threat of reversal hanging over an ALJ's head should he not follow the unwritten rules we choose to impose "on a case by case basis." 708 F.2d at 1052 (citation omitted). Suffice it to say, there is little "to guide the [ALJ's] decisionmaking or our review." *Rowden v. Chater*, 87 F.3d 1315, *1 (6th Cir. 1996) (per curiam) (Unpublished Table Decision).

In view of the impracticality and atextual roots of *Lashley*'s "heightened duty" standard, it is no wonder that panels of this Court have been reluctant to apply it. To my knowledge, in the nearly 40 years since *Lashley*, we have only once, in an unpublished decision, found that an ALJ's factual development fell short of *Lashley*'s "special duty." And that case, it bears noting, turned on facts as extreme as those in *Lashley*: an unrepresented claimant with only a sixth-

grade education who could not read "except for some 'little words.'" *Lambdin*, 62 F. App'x at 624. A rule that has relevance only once every two decades strikes me as a historical artifact, not a settled practice. And going forward, we would be wise not to upset the Social Security Administration's carefully crafted procedures with judge-made standards.